977 So.2d 1145 (2007)
UNIVERSITY OF MISSISSIPPI MEDICAL CENTER, Appellant,
v.
Gloria JOHNSON, Administratrix of the Estate of Brenda Easter, Deceased, Appellee.
No. 2005-CA-02191-COA.
Court of Appeals of Mississippi.
May 22, 2007.
Rehearing Denied September 18, 2007.
*1147 Anastasia G. Jones, Mildred M. Morris, Walter T. Johnson, Jackson, attorneys for appellant.
Ellis Turnage, attorney for appellee.
Before MYERS, P.J., IRVING and BARNES, JJ.
IRVING, J., for the Court.
¶ 1. The University of Mississippi Medical Center (UMC) appeals a judgment of the Hinds County Circuit Court finding it liable under the Mississippi Tort Claims Act for the death of Brenda Easter. Gloria Johnson, Easter's sister, filed a medical malpractice action against UMC, alleging that its doctors, nurses, and medical lab staff deviated from the standard of care by failing to diagnose Easter with pneumonia. Johnson alleged that this failure and lack of treatment during Easter's hospital stay resulted in Easter's untimely death. Following a two-day bench trial, the trial court entered a ruling in Johnson's favor, awarding her $534,025. Aggrieved, UMC appeals and makes several arguments which we recast as follows: (1) the trial court erred in admitting a critical hearsay statement and in making findings of fact that are either unsupported by the record or are based on incredulous testimony, (2) the trial court disregarded evidence that is in conflict with its ruling, and (3) the trial court improperly calculated the damages by not taking into account Easter's medical condition.
¶ 2. Although some of the trial court's findings of fact mischaracterize the testimony upon which they are based, we find that there is substantial, credible, and reasonable evidence undergirding the trial court's judgment. Therefore, we affirm.

FACTS
¶ 3. On August 17, 1999, Easter arrived at UMC, in Jackson, Mississippi, for a cesarean section. Although UMC nurses noted that Easter had an expiratory wheeze before delivery, she went on to deliver a healthy baby girl. Following her delivery, Easter experienced hot flashes, and on August 20, 1999, she was noted as having "episodes of dry coughing during the day." According to Lou Jessie Griffin, the father of Easter's children,[1] she was *1148 scheduled to be released from UMC on Thursday, August 19, 1999. However, Griffin testified that Easter informed him that she would not be released from the hospital until Friday, August 20, 1999, because her blood pressure was elevated and she was having difficulty breathing.
¶ 4. Sandra Russell was also a patient at UMC on August 17, 1999. She had delivered a child the previous day and shared a room with Easter. Russell testified that she observed Easter sleeping upright in a chair the day after Easter gave birth. Russell stated that Easter told her that she did not sleep lying down because when she did she felt as if she were drowning. Further, Russell testified that she suggested to Easter that Easter tell her doctors about the breathing problem that she was experiencing. Russell was discharged before Easter, and she had no further communications with Easter.
¶ 5. Easter was discharged on Friday, August 20, 1999. Griffin testified that he took Easter and the baby to their home in Carthage, Mississippi. He stated that Easter appeared to be doing well on Friday, but she began having trouble breathing late Saturday evening into the early morning hours of Sunday, August 22, 1999. Griffin also testified that Easter asked him to go to her mother's house, which was nearby, to get some Vicks VapoRub because she was having trouble breathing. He stated that he returned home, rubbed the VapoRub on Easter's chest, and that he and Easter fell asleep. Griffin stated that their son woke him up and informed him that something was wrong with Easter. He testified that he found Easter standing on the porch of their home trying to breathe. Griffin called an ambulance, but Easter collapsed in his arms before it arrived. He stated that prior to her collapsing, she began regurgitating pinkish foam and after she collapsed white foam started coming out of the side of her mouth. The ambulance arrived, and Easter was rushed to Leake County Memorial Hospital where resuscitation efforts were conducted, but to no avail. Emergency medical personnel noted that Easter had pink frothy sputum in her airway. The Leake County coroner pronounced Easter dead at 2:14 a.m.
¶ 6. Additional facts, as necessary, will be related during our discussion of the issues.

ANALYSIS AND DISCUSSION OF THE ISSUES
¶ 7. "A circuit judge sitting without a jury is accorded the same deference with regard to his findings as a chancellor, and his findings are safe on appeal where they are supported by substantial, credible, and reasonable evidence." City of Clinton v. Smith, 861 So.2d 323, 326(¶ 16) (Miss.2000) (quoting Maldonado v. Kelly, 768 So.2d 906, 908(¶ 4) (Miss.2000)). In addition, the Mississippi Supreme Court has held that "[w]here a chancellor adopts, verbatim, findings of fact and conclusions of law prepared by a party to the litigation, this Court analyzes such findings with greater care, and the evidence is subjected to heightened scrutiny." In re Estate of Grubbs; Jacks v. Woods, 753 So.2d 1043, 1046(¶ 8) (Miss.2000) (citing Brooks v. Brooks, 652 So.2d 1113, 1118 (Miss.1995)). UMC contends, and our review of the record confirms, that the trial court adopted substantially all of the Appellee's findings of fact. Therefore, we review the record de novo. Miss. Dep't of Transp. v. Johnson, 873 So.2d 108, 111(¶ 8) (Miss.2004) (citing Brooks, 652 So.2d at 1118).
¶ 8. We begin our analysis with a discussion of the specific arguments raised by UMC and conclude with a discussion of the expert testimony which, in our view, supports the trial court's finding of liability *1149 against UMC, notwithstanding the misstatements in the trial court's findings of fact.
1. The Hearsay, Incredulous Testimony, and Unsupported Findings of Fact
(a) Testimony of Sandra Russell, Easter's Roommate
¶ 9. UMC provides several reasons to support its contention that Russell was not a credible witness. First, UMC contends that Russell was not credible because she "was under the influence of pain medication during the period of time that the events occurred regarding her testimony." Second, UMC asserts that Russell was biased in favor of Easter's family because her trial testimony contradicted her statement in her affidavit that Easter appeared to be feeling well during the time the two of them shared a room. Third, UMC argues that Russell's testimony regarding Easter's breathing problems is not corroborated by Easter's medical records.
¶ 10. Finally, UMC contends that Russell's testimony regarding what Easter told her about Easter's breathing problems was inadmissible hearsay that carried considerable weight with the trial court. UMC argues that the trial court's decision to place in bold print the portion of Russell's testimony regarding Easter's breathing problems is proof of its importance to the court, as this is the only testimony in the entire opinion that is in bold print, other than the portion which enumerates the amount of damages.
¶ 11. "The trial judge, sitting in a bench trial as the trier of fact, has the sole authority for determining the credibility of the witnesses." City of Jackson v. Lipsey, 834 So.2d 687, 691(¶ 14) (Miss. 2003) (citing Rice Researchers, Inc. v. Hiter, 512 So.2d 1259, 1265 (Miss.1987)). Therefore, it was the trial judge's prerogative to place whatever weight she chose on Russell's testimony. This said, we hasten to add, however, that the resolution of the issue of UMC's negligence, vel non, does not depend on Russell's testimony, as negligence on the part of a defendant in a medical malpractice action can only be established by medical expert testimony that the defendant failed to use ordinary skill and care. Brooks v. Roberts, 882 So.2d 229, 232(¶ 10) (Miss.2004). Since we find the medical testimony sufficient to support the trial court's judgment of liability against UMC, Russell's testimony is essentially irrelevant We also disagree with UMC's assertion that Russell's statement was inadmissible hearsay. Although Johnson did not address this issue, Rule 803(3) of the Mississippi Rules of Evidence clearly allows the admission of Russell's testimony.[2]
¶ 12. Our review of the record reveals that neither of Johnson's experts relied on any of Russell's testimony. In fact, Johnson's medical experts testified by depositions which were taken prior to Russell's trial testimony. Therefore, they could not have relied on any of Russell's trial testimony *1150 in forming their medical opinions. Further, as to UMC's contention that "there is no credible testimony to support [the trial court's] finding of fact that Brenda Easter had trouble breathing while she was hospitalized," we point to the trial testimony of Griffin that on the day following Easter's delivery "she had complications of breathing." We also note that Griffin's deposition testimony corroborated his trial testimony on this issue, except that in his deposition, Griffin said that Easter complained of breathing on the second day instead of the next day following delivery.
(b) Unsupported Findings of Fact
¶ 13. In this issue, UMC argues that the trial court made findings of fact which are not supported by the record. First, UMC directs our attention to a footnote in the opinion which states: "[Dr. Steven Hayne] is the only expert with extensive experience in forensic pathology whereby he is charged with determining the manner, means and cause of death." We agree that the trial court erred in reaching this conclusion, as defense expert Dr. Leroy Riddick is board certified in forensic pathology and, at the time of trial, was the medical examiner for the State of Alabama. He had held this position since 1979. Nevertheless, we do not consider this erroneous finding of fact to constitute reversible error, as it is not outcome determinative.
¶ 14. Second, UMC asserts that the trial court erred in finding that "Easter described [her] difficulty breathing as feeling as if [she] was drowning." In support of this assertion, UMC contends that Russell never testified that "Easter had difficulty breathing," and that "the medical records state the opposite." On this point, the record reveals the following exchange between Russell and Johnson's attorney:
Q. At night how did Brenda Easter sleep?
A. I guess she would lay down, but sometimes.
Q. Okay. And did you ever observe her sleeping in a chair?
A. Yes, I did.
Q. Why was she sleeping in a chair?
A. Because she told me when she lay down, it felt like she was drowning.
On cross-examination, under questioning from UMC's attorney, Russell continued her testimony:
Q. The doctors would come around at 5:00 in the morning, 5:30 a.m. is that right?
A. That's correct.
Q. And Brenda Easter would be sitting up in a chair at that time because it's your testimony she couldn't breathe?
A. Yes.
In our view, the quoted passages are ample support for the trial court's finding that Russell testified that Easter had difficulty breathing.
¶ 15. Third, UMC contends that the trial court erred in making the following finding: "Dr. Hayne does not believe that [the large amount of gray pus, fluid and mucous in Easter's lungs] was related to the resuscitation efforts of the emergency medical personnel." Again, we agree with UMC that Dr. Hayne did not testify specifically to this finding, but his autopsy report finds that Easter died of bronchopneumonia, and the postmortem examination revealed "a large amount of purulent serosanguinous fluid that [had] an opaque pink discoloration [exuding] from the cut surfaces of the lungs." Additionally, Dr. Hayne's autopsy report indicated that "[c]ompression of the lungs [revealed] the presence of gray-pus in the walls of both *1151 the right and left lungs diffusely." Therefore, it is reasonable to infer that Dr. Hayne attributed the condition of Easter's lungs to bronchopneumonia, and not to the resuscitation efforts as theorized by UMC in support of its contention that Easter died of cardiomyopathy.
¶ 16. Notwithstanding UMC's theory as to the cause of Easter's death, we note that UMC failed to broach with either Dr. Hayne or Dr. Robert E. Pieroni, Johnson's expert witnesses, the matter of the graypus or purulent serosanguinous pink-colored fluid in Easter's lungs. It would seem logical that UMC would have extensively cross-examined Drs. Hayne and Pieroni on this point since this went to the heart of Johnson's case.
¶ 17. Fourth, UMC contends that the trial court erred in finding that Easter developed bronchopneumonia prior to her release from UMC, and argues that "[t]here is no expert testimony that Easter had bronchopneumonia at that time." UMC points out that Dr. Pieroni stated that pneumonia can present itself within hours; thus, UMC argues that if Easter in fact died from pneumonia, she could have developed it after her discharge because she died thirty-six hours after her release. We note that Dr. Pieroni also stated, "And just looking back, I mean, she had the pneumonia on [the date of] her death which, as you mentioned, was just 36 hours after she was discharged from the hospital. So it's undoubtedly [sic] the pneumonia was preexisting and it would have shown up on x-ray." (Emphasis added) Therefore, based on the totality of Dr. Pieroni's testimony, we cannot agree that the record is devoid of expert testimony indicating that Easter had bronchopneumonia. Although Dr. Hayne was not as emphatic as Dr. Pieroni that Easter had pneumonia while a patient at UMC, he was certain that "it would take more than one day, probably several days for this type of infection to develop." Based on the testimony of Drs. Pieroni and Hayne, we find no merit to this allegation of error.
¶ 18. Fifth, UMC argues that the trial court erred in finding that Easter had breathing difficulty "[o]n August 17, 1999, the morning after the surgery." UMC further argues that this finding is "critical because whether Easter had breathing problems during her hospitalization was a central issue in the case" and "there is no other finding of fact that Easter had a breathing problem at another time." UMC presses the point further with its assertion that "there is no evidence in the medical records that she had a breathing problem as a hospital patient." UMC is correct that there is no evidence that Easter had a breathing problem on August 17, but, as previously discussed, there is evidence from Griffin that Easter had a breathing problem during her hospital stay. Further, according to Dr. Pieroni, Easter could have had pneumonia while at UMC even if she did not experience breathing difficulty while there, because "[pneumonia] can smolder and then all of a sudden go into a brushfire in a conflagration, as what happened in this patient, who had been par-most likely partially treated with 5 million [sic] units of penicillin she received on one occasion, on the 17th."
¶ 19. Sixth, UMC argues that the trial court erroneously found that "Dr. Riddick noted that Easter had developed a heart murmur and should have obtained a cardiology consult." Specifically, the trial court's opinion stated, "Dr. Riddick noted that Easter's UMC chart indicated she developed a heart murmur on August 19, 1999, yet no cardiology consult was obtained." We find that UMC has mischaracterized the trial court's finding, as there is nothing erroneous in the trial court's *1152 statement. We find no merit to this allegation of error.
(2) The Trial Court's Disregard of Evidence in Conflict with its Ruling
¶ 20. In this issue, UMC argues that the trial court's decision is not based on substantial evidence because the opinion disregards evidence which is in conflict with its ruling. Specifically, UMC contends that the trial court ignored the testimony of its experts, who provided an explanation for the cause of Easter's symptoms.
¶ 21. We note at the outset that a trial court commits no error in finding one expert more persuasive than another, as the trial court, sitting as the trier of fact, is the sole judge of the credibility of all witnesses, including experts. Jacob Hartz Seed Co. v. Simrall & Simrall, 807 So.2d 1271, 1274-75(¶ 15) (Miss. Ct.App.2001) (citing McCallum v. Laird, 244 Miss. 273, 275, 142 So.2d 32, 32 (1962)). In Simrall, this Court held that "[t]he mere fact that testimony is disputed does not render it incredible." Id. "Unless the testimony is so incredible as to be absolutely unworthy of belief, this Court will not re-weigh the evidence." Id. We next address in further detail the expert testimony supporting both theories as to the cause of Easter's death, and will return to this issue after our discussion of the expert testimony.
3. Expert Testimony
(a) Johnson's Experts
¶ 22. Johnson offered two experts, who testified by deposition: Dr. Hayne, an expert in the fields of anatomical, clinical, forensic pathology, and forensic medicine, and Dr. Pieroni, an expert in internal medicine. Dr. Hayne performed an autopsy on Easter and testified that she died from bronchopneumonia, which, in his opinion, probably took several days to develop. The postmortem examination also found atelectasis, which is defined as a collapse of the small airways. He also testified that Easter's lungs were slightly enlarged, specifically stating that her left lung was double its normal size. Dr. Hayne concluded that the enlargement was caused by a bacterial infection involving both lungs. He also stated that Easter suffered from coronary artery blockage on the left and the right, which played a contributory role in her death. Despite the coronary artery disease, Dr. Hayne stated that Easter would have survived in the absence of the bronchopneumonia, as it was the immediate cause of death.
¶ 23. Similarly, Dr. Pieroni noted that Easter had coronary heart disease, but, based on his review of Easter's medical records, concluded that she died of severe or massive bilateral pneumonia, which was caused by a bacterial organism. Dr. Pieroni stated that the pneumonia may have been masked by five milli-units of penicillin which Easter received prior to her cesarean section to prevent Easter and her newborn from developing an infection. Prior to delivery, Easter's temperature was 99.3, which Dr. Pieroni considers a low-grade fever. In Dr. Pieroni's view, this low-grade fever was significant because "this particular patient didn't show fevers when she was having infections." According to Dr. Pieroni, Easter's temperature dropped to about 96 at the time of her cesarean section. He opined that such a drop in temperature "can be ominous." He also noted that on August 20, Easter's hospital progress notes indicate that she was suffering from "mild abdominal and back pain and that she was given Tylenol and ibuprofen." Dr. Pieroni noted that Tylenol can suppress a fever and that Easter was discharged on ibuprofen. However, Easter was not given any antibiotics *1153 to treat the pneumonia, which Dr. Pieroni concluded would have been standard treatment.
¶ 24. Dr. Pieroni further testified that Easter was anemic, which he did not consider uncommon because of her pregnancy. However, he noted that Easter's hemoglobin and hematocrit counts were lower than what he would expect, even after taking into consideration that smokers[3] usually have increased hemoglobin counts. Dr. Pieroni also addressed Easter's smoking as it related to his conclusion that Easter died of pneumonia. He stated that it is possible for atelectasis to occur postoperatively in people who smoke cigarettes.
¶ 25. In reaching his conclusion as to Easter's cause of death, Dr. Pieroni focused on Easter's white blood count prior to and after delivery, which he opined was higher than it should have been. Dr. Pieroni reached this conclusion by relying on a study which found that prior to delivery the white blood count should be below 11,600. Easter's white blood count was recorded at 13,700. He also noted that Easter's white blood count rose to 15,200 after her cesarean, which he concluded was higher than the normal range for postcesarean patients.
¶ 26. Dr. Pieroni conceded, on cross-examination, that an elevated white blood count after a cesarean is not uncommon; however, he stated that a count of 15,200 is considerably high. Dr. Pieroni opined that the increase in Easter's white blood count should have alerted UMC's nurses and physicians that she was suffering from an infection. Nevertheless, Easter's white blood count was not addressed by the medical staff, which, according to Dr. Pieroni, is a deviation from the standard of care. Dr. Pieroni stated: "So the standard of care would indicate that one finds out what are the reasons for these abnormal findings, this  these signs and symptoms of infection."
¶ 27. In Dr. Pieroni's opinion, Easter did not die from peripartum cardiomyopathy, because there was no evidence of a myocardial infarction. Upon considering Easter's expiratory wheeze, hot flashes, low-grade temperature, and dry cough, he stated that "[t]he most logical diagnosis is respiratory infection, and I saw no workup." Dr. Pieroni noted that Easter was given Entex LA for her dry cough. Dr. Pieroni concluded that Easter's symptoms signaled a respiratory infection which required at least a chest x-ray, because the x-ray yields a more accurate result than auscultatory findings. The record reflects the following exchange on this point:
Q. So you  you just totally play down all the references in the regular care records for the days that she was in the hospital that the nurse or the physician noted lungs "CTA"?
A. Yes. That's "clear to auscultation." And I have already told you auscultatory findings are notoriously unreliable. One depends more on a positive finding than they do on a negative. Was this patient sitting up? Was it taking deep respirations? These are all important factors when you're talking about breath sounds. As I have already stated to you, the diagnosis is best made with the chest x-ray if you're looking for causes of abnormal breath sounds, if you're looking for causes of coughing, which this patient continued to exhibit.
*1154 ¶ 28. Dr. Pieroni also testified that UMC personnel did not do any follow-up lab tests or chest x-rays. He stated: "it's undoubtedly [sic] the pneumonia was preexisting and it would have shown up on x-ray." In Dr. Pieroni's opinion, an x-ray would have yielded the most accurate diagnosis. When taking all of Easter's symptoms together, Dr. Pieroni stated that "the patient obviously wouldn't [sic] have been discharged from the hospital, as she was on the 20th."
(b) UMC's Experts
¶ 29. UMC presented six expert witnesses at trial: Dr. John Morrison, chairman of the Department of OB-GYN at UMC; Dr. James Jones, a pulmonary and critical care physician; Dr. Grace Shumaker, a hematologist and oncologist; Dr. Riddick, a forensic pathologist; Dr. Stanley Chapman, an infectious disease specialist; and Dr. Malcolm Taylor, a cardiologist. Ivory Davis, UMC's nursing clinical director, testified as a lay witness rather than as an expert.
¶ 30. According to Davis, she met Easter for the first time on the day Easter was discharged. Davis stated that she asked Easter if she had any complaints, and Easter responded that she did not. She testified that Easter was seen by nurses numerous times throughout her stay. Davis pointed out that the nurses' notes indicates that Easter's lungs were "clear to auscultation," in addition to being clear bilaterally. She stated that if there had been a problem with Easter's lungs, the nurses would have detected it during Easter's chest examination.
¶ 31. On cross-examination, Davis stated that Easter's white blood count on August 17 was 13,700, which she considered high. Further, Davis testified that Easter's white blood count rose to 15,200 the following day. She stated that Easter's hematocrit and hemoglobin counts were low prior to and after Easter's cesarean. Davis testified that Easter's chart does not indicate that any further lab tests were done. Johnson's attorney posed the following question to Davis: "And you recognize as a nurse that these are abnormal lab values, right?" She responded, "Yes."
¶ 32. Davis testified that the nurses' notes did not indicate that any physician had been notified about Easter's white blood count, hematocrit, and hemoglobin levels. However, on redirect, Davis stated that the reference ranges to which she had been referring were for the general population and not for the pregnant population. She explained that UMC's lab uses a general lab sheet which does not take into account that pregnant patients' levels fall into different ranges than the general population. She also stated that it is common to see postpartum patients with white blood counts in the range of Easter's. Davis testified further that it is not unusual for a patient to experience hot flashes after delivery.
¶ 33. Dr. Morrison also testified that Easter's white blood counts were within the normal range for a pregnant female and that there was no need for any additional testing. Additionally, he stated that the expiratory wheeze and hot flashes were normal. Specifically, Dr. Morrison testified that expiratory wheezing commonly occurs during pregnancy, because the abdomen is "pressing up on her thorax or where the lungs are." Dr. Morrison stated that hot flashes commonly occur because "[w]hen you remove the placenta after the baby is delivered, you take away all the hormones that the placenta is producing." He further explained that "that abrupt drop, just like when women go through menopause, will give you, you know, a hot flash. . . ."
*1155 ¶ 34. Further, Dr. Morrison testified that, in his opinion, Easter's heart murmur was a pre-existing condition that did not develop while she was a patient at UMC. Dr. Morrison provided two explanations for Dr. Hayne's autopsy findings: (1) Easter experienced rapid onset pneumonia after her release from UMC, or (2) the autopsy is flawed. Dr. Morrison firmly stated that there is no indication that Easter had pneumonia nor any type of infection while she was a patient at UMC. He also testified that a dry cough is not a symptom of pneumonia.
¶ 35. Dr. Jones also did not believe that Easter's dry coughing was a symptom of pneumonia. He testified that if Easter had suffered from pneumonia, she would have had a productive cough,[4] rather than a dry cough, which can derive from many sources. Dr. Jones also pointed out that Easter was treated for this dry coughing. He addressed Easter's wheeze by stating, "There was mentioned prior to her delivery of a transient wheeze [sic], which you will occasionally encounter in term pregnancies just because of the compression of a lung from the elevated uterus and fundus. That is not remarked on any other exam after her delivery." As for Easter's temperature, Dr. Jones stated that Easter did not have any significant fever and that her vital signs summary indicated that her temperature was within normal range. Moreover, Dr. Jones testified that there were no alterations in Easter's blood pressure which would have indicated a significant infection.
¶ 36. Dr. Jones made reference to the autopsy report and concluded that the congestion which was noted in Easter's lungs could have been caused by the efforts to resuscitate her. Dr. Jones stated that the attempts at resuscitation "would include the physical breathing for her with a bag valve or an amboo [sic] bag. All of these things, plus the introduction of an endotracheal tube through her mouth would give you bacteria in the respiratory tract." Dr. Jones disagreed with Dr. Hayne's findings, but conceded that he is not a pathologist. He also stated that Easter's temperature decrease from 99.3 to 97 was not alarming and was within the normal range.
¶ 37. Dr. Shumaker also disagreed with Dr. Hayne's findings and testified that Easter's white blood count, hematocrit, and hemoglobin levels were within the normal range. She testified that she would not have done any follow-up tests, because Easter did not display any sign of an infection and because Easter's levels, though elevated were within the normal range.
¶ 38. Dr. Riddick performed a slide presentation where he compared autopsy photographs of Easter's lungs with photographs of the lungs of a female who had chronic lung disease, emphysema, and pneumonia. He testified that the air spaces in Easter's lungs were clear, unlike the lungs of the female in the slide presentation, which were filled with fluid and inflammatory cells. Dr. Riddick opined that the photographs of Easter's lungs did not show any signs of pneumonia. Further, Dr. Riddick testified that if Easter died from pneumonia, he would expect her lungs to look more like the lungs of the female in the slide presentation.
¶ 39. Dr. Riddick also disagreed with Dr. Hayne regarding Easter's cause of death. He concluded that Easter died of peripartum cardiomyopathy. He also provided several reasons for Easter's heart *1156 murmur: (1) she was anemic, (2) she had recently given birth, (3) she had lost some blood, and (4) she had a rapid heart rate. When asked whether a heart murmur would indicate the need for a cardiology consult or further testing, Dr. Riddick replied, "I would defer to a cardiologist or an internist of how assiduous you're going to be in a workup of just having a murmur for the first time in somebody who is anemic and postpartum." Dr. Riddick also disagreed with Dr. Hayne regarding the collapse of Easter's lungs, as he attributed the collapse to the resuscitation efforts.
¶ 40. Dr. Chapman disagreed with Dr. Pieroni's findings that Easter's hospital records indicated the need for a consultation with an infectious disease specialist. Dr. Chapman also took issue with Dr. Pieroni's conclusion that Easter's temperature of 99.3 constituted a fever. He stated that a temperature of 99.3 is not accepted as a fever. Furthermore, he testified that a red flag is not raised until a patient has had a temperature of at least 100.3 on two consecutive occasions.
¶ 41. Dr. Chapman's conclusion was different from Dr. Pieroni's conclusion regarding the findings in the Journal of Obstetrics and Gynecology which were relied upon by Dr. Pieroni. Dr. Chapman testified: "actually the article that he cited looked at the change in the white count in patients who are admitted for cesarean section, 24 hours after cesarean section whether the change in the white count can be used as an indicator of underlying infection." Dr. Chapman testified that the standard of care was met because Easter's white blood count was taken within twenty-four hours and not twenty-four hours after her cesarean, because at this time Easter's white blood count was within normal range.
¶ 42. Dr. Taylor opined that Easter died from postpartum cardiomyopathy, pointing out that Easter had significant underlying coronary artery disease. He attributed Easter's dry cough to her smoking habit. Dr. Taylor also disagreed with Dr. Hayne's conclusion that Easter died of pneumonia, and contends that there is nothing to support Dr. Hayne's analysis. Dr. Taylor testified that atelectasis is consistent with heart failure and pneumonia, but noted that it is not consistent with bilateral severe pneumonia, which was Dr. Hayne's diagnosis. Dr. Taylor also noted that, while at UMC, Easter's heart and lungs were examined, her vital signs were taken, and she did not show any signs of a cardiac problem. When asked whether the color of the sputum that was seen in Easter's airways and emanating from her mouth was significant or made a difference, Dr. Taylor gave this response:
Well, in heart failure [the foam-like substance] can be white. In some people it can be white or pinkish. But the fact that she was in heart failure and fluid overloaded after she was discharged, not during the hospitalization, is more consistent with heart failure. We see this as a classical finding of heart failure in my experience.
¶ 43. Now that we have discussed the expert testimony offered by both Johnson and UMC, we briefly return to UMC's argument that the trial judge ignored or disregarded evidence in conflict with its ruling. This is an interesting assertion because in every case the trier of fact accepts certain evidence while rejecting other evidence. This is the classic case of the battle of the experts, as Johnson's experts contend that Easter had symptoms of pneumonia which were ignored by UMC, while UMC's experts contend that Easter showed no signs of pneumonia while at UMC.
¶ 44. We cannot agree with UMC that simply because the trial court was more persuaded by the findings of Dr. Hayne and Dr. Pieroni it "disregarded glaringly *1157 obvious evidence." "Disregard" means to pay no attention to. There is a huge difference between rejecting something because the argument in support of it is unpersuasive, and failing to embrace something because it was never noticed. Our review of the record indicates that it was the former course of action that was taken by the trial court. This assessment is borne out by the following quote from the trial court's opinion: "Defendants' expert witnesses Dr. Jones . . . and Dr. Taylor rendered expert opinions that Easter's death was sudden and most likely a cardiac event and that there were no clinical signs and symptoms of pneumonia or of an infection." Therefore, although the trial judge may not have accepted Drs. Jones' and Taylor's findings, she did take them into consideration in reaching her decision.
4. Damages
¶ 45. The trial court awarded Easter's family a total of $534,025 in damages. The court determined the present value of Easter's future earnings to be $170,000. Additionally, the trial court awarded $1,900 for funeral expenses, $10,000 for pain and suffering, $2,125 for past medical bills, and $350,000 to Easter's children for loss of companionship. UMC challenges the method that the trial court used to calculate Easter's future earnings and argues that "the calculation did not consider Easter's reduced life expectancy because of her cardiac condition." We cannot agree with UMC's contention, as the record clearly belies this allegation of error.
¶ 46. Louis Smith, Ph.D. was accepted as an economic expert qualified to calculate the present value of future earnings. Smith testified as follows on cross-examination:
Q. And I take it that you were not told that according to the pathologist who performed her autopsy, she did have a heart condition that would have affected her life expectancy?
A. It would have affected her life expectancy. That's a medical opinion. I wouldn't know that.
Q. And, of course, you didn't take that into account and figure in the work expectancy because you didn't know that, right?
A. Well, the work life expectancy does take into account absences because of health and other types of reasons.
Q. And again it's average, is it not?
A. It is an average.
Q. And some people live a lot shorter time than the life span calculated to come to that work life expectancy, and some people may live and work a longer time?
A. That's the definition of average, ma'am.
Thus, based on Smith's testimony, we cannot find that the trial court erred in finding Easter's future earnings to be $170,000. This issue lacks merit.
5. Reliability of Johnson's Experts
¶ 47. Finally, UMC contends that the trial court erred in relying on the testimony of Drs. Hayne and Pieroni because neither satisfies the Daubert[5] standard for reliability. Additionally, UMC argues that Dr. Pieroni's testimony is based on facts which are not supported by the record. We acknowledge that UMC moved to strike Dr. Pieroni's deposition testimony and sought to have it removed from evidence based on its conclusion that "[Dr. Pieroni's testimony] contains numerous *1158 errors of fact which have been refuted by the introduction of a lot of evidence during the defense case." However, we point out that there is nothing in the record to reflect that UMC made a Daubert objection at trial or in any motion to the testimony of either Dr. Pieroni or Dr. Hayne. The issue as to Dr. Hayne's reliability in any form was raised for the first time in UMC's reply brief. The Daubert challenge to Dr. Pieroni was also made for the first time in UMC's reply brief. Therefore, this issue is procedurally barred. Johnson v. State, 508 So.2d 1126, 1127 (Miss.1987) (citing Evans v. State, 485 So.2d 276, 282 (Miss.1986)).
¶ 48. THE JUDGMENT OF THE CIRCUIT COURT OF HINDS COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
KING, C.J, LEE AND MYERS, P.JJ., CHANDLER, BARNES, ISHEE, ROBERTS AND CARLTON, JJ., CONCUR. GRIFFIS, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION.
NOTES
[1] Brenda Easter is survived by two children, both fathered by Griffin.
[2] Rule 803 provides several exceptions to the prohibition against the admission of hearsay evidence, including an exception that is applicable here. Subsection (3) provides for the admission of:

[a] statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.
Clearly, Easter's statement to Russell was a statement of Easter's "then existing state of mind, emotion, sensation, or physical condition."
[3] The record indicates that at the time of her death Easter smoked approximately a half pack of cigarettes a day.
[4] Dr. Jones defines a productive cough as a cough which produces sputum, which is commonly referred to as phlegm.
[5] Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).