# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2014-CA-01022-COA

**ROGER LYNN NEELY**                                                    **APPELLANT**

**v.**

**KALEB MATTHEW WELCH**                                          **APPELLEE**

DATE OF JUDGMENT:               05/08/2013
TRIAL JUDGE:                            HON. DAVID SHOEMAKE
COURT FROM WHICH APPEALED:  SIMPSON COUNTY CHANCERY COURT
ATTORNEY FOR APPELLANT:    RENEE M. PORTER
ATTORNEYS FOR APPELLEE:     WESLA ANN SULLIVAN LEECH
                                           ALEITA M. SULLIVAN
NATURE OF THE CASE:             CIVIL - DOMESTIC RELATIONS
TRIAL COURT DISPOSITION:       FULL CUSTODY OF THE MINOR CHILD
                                           GRANTED TO THE NATURAL FATHER
DISPOSITION:                         AFFIRMED - 11/10/2015
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**BEFORE IRVING, P.J., ISHEE AND WILSON, JJ.**

**WILSON, J., FOR THE COURT:**

¶1.    The facts of this case are undeniably tragic.  In August 2012, Holly Jennings Neely passed away at the age of twenty as a result of complications from childbirth.  Her newborn son also died.  Holly was survived by her daughter, Riley Grace Neely, who was then not quite two years old, and her husband, Roger Neely, who was Riley's stepfather.  A contentious custody dispute ensued between Roger and Riley's biological father, Kaleb Welch.  The chancellor observed that both men, as well as their families, clearly loved Riley very much.  Ultimately, the chancellor granted Kaleb physical and legal custody and granted

specified visitation to Riley's maternal grandparents. Roger was awarded neither custody nor visitation. While the facts of this case are heartbreaking, the law that governs them—in particular the natural parent presumption—is clear, and the chancellor applied it correctly. Accordingly, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶2.     On September 28, 2010, Holly Jennings Neely gave birth to a daughter, Riley Grace. Holly and her husband, Roger Neely, had been married less than three weeks when Riley was born, and both Holly and Roger knew that he was not Riley's biological father. Riley's biological father is Kaleb Welch, with whom Holly had a prior relationship. Nonetheless, Riley's birth certificate listed Roger as the father and gave her the surname Neely.

¶3.     Six months after Riley's birth, Kaleb filed a petition for a determination of paternity and custody. Kaleb's petition alleged that Holly had represented to him that he was Riley's biological father. Kaleb's petition sought genetic testing and, if he was shown to be the father, joint custody. Kaleb's petition also confirmed that he would pay child support if shown to be Riley's father.

¶4.     Holly's answer admitted that she had represented to Kaleb that he was Riley's father. Holly also admitted that if genetic testing confirmed her representation, Kaleb would be entitled to "joint legal custody and . . . standard visitation rights," but Holly asked that "she be granted primary physical custody of [Riley]."[1] Holly also agreed that Kaleb should be

---

[1] "Although it is a phrase commonly used by lawyers and judges," including appellate judges, "there is actually no provision under the statute for 'primary' physical custody." *Rush v. Rush*, 932 So. 2d 794, 796 (¶9) (Miss. 2006). The statute provides for "joint physical custody and physical custody in one parent or the other." *Id.* (citing Miss. Code

required to pay child support.

¶5.     Testing confirmed that Kaleb is Riley's biological father, and on November 11, 2011, the chancellor signed an agreed order establishing paternity, custody, and child support. Under the terms of the order, Riley's birth certificate was amended to identify Kaleb as her biological father, but her surname remained Neely. Kaleb and Holly were granted joint legal custody, Holly was granted physical custody, and Kaleb was granted essentially "liberal" visitation,[2] structured to coincide with his offshore work schedule. Kaleb was also required to pay child support to Holly, including back child support since the date of Riley's birth. Holly and Kaleb both signed the agreed order.

¶6.     On August 6, 2012, Holly passed away as a result of complications from childbirth.[3] On August 24, Kaleb filed a petition seeking a modification of custody and support, in which he stated that Riley had been in his physical custody since Holly's death. Roger subsequently filed a complaint for emergency custody and other relief and a motion to intervene and response to Kaleb's petition. Roger alleged that granting him physical custody was in Riley's best interest, that he stood *in loco parentis*, and that Kaleb had deserted Riley. In October, the chancellor signed a temporary order directing that physical custody of Riley would alternate between Kaleb and Roger on a two-week basis to coincide with Kaleb's offshore

---

Ann. § 93-5-24). As in this case, the phrase "primary physical custody" is typically intended to describe physical custody in one parent, with the other having specified visitation rights.

    [2] *See Chalk v. Lentz*, 744 So. 2d 789, 792 (¶9) (Miss. Ct. App. 1999).

    [3] A few days before Holly's untimely death, she had given birth to a son. Holly and Roger's son passed away on August 5, 2012.

work schedule. The order stated that all other provisions of the November 2011 order establishing paternity, custody, and support would remain in effect.

¶7. The chancellor appointed a guardian ad litem (GAL) to investigate, to make recommendations to the court, and to act in all respects to protect Riley's best interest. The GAL's report was filed with the court prior to the hearing on permanent custody of Riley. The chancellor informed the parties that he would depend on the report in making his ruling, to which neither party objected.

¶8. The GAL visited with Kaleb and his wife, Kayla, at their home. She observed that Riley appeared to have a good relationship with Kaleb and Kayla and played well and seemed to have bonded with her younger half-sister, Kaylan, whom she called "sissy." The GAL noted that Riley was talkative and playful and crawled into Kaleb's lap and called him "daddy." During the GAL's visit, Kaleb's dad drove up, and Riley was happy to see him and climbed up in his truck with him. Kaleb told the GAL that Riley had returned from visits with Roger with diaper rashes, bruises, and other minor injuries.

¶9. The GAL also visited Roger at the home of Holly's parents, Mike and Gayle Jennings, with whom Roger was then living. Roger and the Jennings denied Kaleb's claims that he had returned Riley to Kaleb with diaper rash or injuries. They alleged that it was the other way around—that Kaleb returned Riley to Roger with diaper rashes, infections, and minor injuries. Roger also claimed that Riley cried and resisted leaving him to go with Kaleb but would "lunge" out of Kaleb's or Kayla's arms to come back to him.

¶10. The GAL also met with other family members: Kaleb's parents and stepmother,

4

Kayla's parents, Kaleb's brother, and Roger's mother and stepfather. Their statements to the GAL lined up with either Kaleb's/Kayla's or Roger's: Kaleb's and Kayla's families believed Kaleb and Kayla were good and loving parents, while suggesting that Roger was neglectful if not abusive, and Roger's family believed exactly the opposite was true.[4] The GAL concluded that Kaleb, Kayla, Roger, the Jennings, and the rest of their families all loved and cared for Riley, and she found no clear evidence of abuse by anyone. She noted that although Riley had seen doctors and nurse practitioners regularly, and Mike Jennings even called DHS at one point (because Riley came home with a splinter in her foot), there was no evidence that any healthcare provider or other qualified professional ever suspected abuse.

¶11.    In the conclusion of her report to the court, the GAL reiterated that it was clear that both Kaleb and Roger loved Riley very much. The GAL also stated that she did not believe that it would be in Riley's best interest for either Roger or the Jennings to be completely out of Riley's life. However, she also concluded that Kaleb had neither abandoned nor deserted Riley, that there was no evidence that Kaleb was an unfit parent, and that Roger did not meet the legal standard for *in loco parentis*. Based on these conclusions, the GAL recommended that Kaleb be granted sole legal and physical custody and that Riley's surname be changed to Welch.

¶12.    A hearing was held on the issue of permanent custody of Riley on April 11, 2013. At the outset of the hearing, the chancellor made clear that the purpose of the hearing was to

---

[4] Kaleb and Roger also traded similar allegations of abuse or neglect in various pleadings. There are also scattered allegations of drug use in the record. However, in October 2012, the court ordered Kaleb, Kayla, and Roger to submit to drug tests, and the results of the tests were all negative.

address the threshold issue whether Roger could make a clear showing of one of the limited grounds for overcoming the natural parent presumption, i.e., abandonment, immoral behavior detrimental to the child, or parental unfitness. Roger's attorney agreed that was Roger's burden and the issue before the court, and she then proceeded to present his case.

¶13. Roger testified and called his mother, his stepfather, and the Jennings as witnesses. Their testimony at the hearing can be summarized as generally consistent with their prior statements to the GAL. They believed that Roger was a good and loving father and should have custody. They believed that Kaleb had abandoned or deserted Riley because he was not there when she was born and during the first six months to one year of her life. And they believed that Kaleb and Kayla were uncaring, unfit, neglectful, or even abusive parents. However, consistent with the GAL's conclusions, no clear evidence of abuse or unfitness was presented—only accusations of inattentiveness, rudeness, or bad language, together with reports of rashes or minor injuries. After Roger rested, Kaleb moved to dismiss Roger's complaint for custody on the ground that Roger had failed to present evidence sufficient to overcome the natural parent presumption.

¶14. The chancellor then called the families back into the courtroom to deliver and explain his ruling. He explained—as he had at the outset of the hearing—that to rebut the natural parent presumption, Roger needed to present clear and convincing evidence that Kaleb had abandoned or deserted Riley, that Kaleb's behavior was so immoral as to be harmful to Riley, or that Kaleb was an unfit parent. The chancellor found that Roger failed to meet this burden. He found that Kaleb's petition for custody only six months after Riley was born and

6

his subsequent financial support and involvement in her life defeated any claim of abandonment or desertion. He also found that there was no evidence of abuse or unfitness but only reports of minor injuries or rashes of the kind that "happen with all children." Accordingly, he found "no evidence that Kaleb Welch is guilty of anything that would overcome the legal presumption that the best interest of the child requires the child to be in the custody of the surviving natural parent." The chancellor told the families that it was clear that they all loved Riley and that he felt for all of them, especially Roger. However, as the natural parent, Kaleb was entitled to custody.

¶15. The chancellor suggested that, unless an agreement could be worked out, Roger and the Jennings could petition for visitation. Roger's attorney then noted that Roger's pleadings already included an alternative request for visitation. The chancellor responded, "[T]hen I want [you] to try to work out some kind of reasonable visitation. But he is certainly, in my opinion, entitled to some kind of visitation."

¶16. On May 10, 2013, judgment was entered awarding sole legal and physical custody to Kaleb, changing Riley's surname to Welch, and dismissing Roger's pleadings with prejudice. In the judgment, consistent with his ruling from the bench, the chancellor found that Roger had "wholly failed to prove by clear and convincing evidence" any ground for overcoming the natural parent presumption. "In order to avoid a multiplicity of suits," the judgment did grant the Jennings visitation with Riley one weekend each month, one week in July, and on specified holidays. But Roger was not granted any visitation rights. Roger filed a motion for a new trial or reconsideration, which was denied in June 2014, and then appealed.

**ISSUES**

¶17. Roger raises four issues on appeal: (1) that "the abrupt change of custody and complete and total termination of all standing and rights of . . . Roger to Riley . . . is manifest error in that [Riley's] best interest . . . was ignored" and no *Albright*[5] analysis was conducted; (2) that "he overcame the natural parent presumption," and the chancellor's ruling to the contrary is error; (3) that the chancellor's "failure . . . to consider [him] as *in loco parentis* in an atypical and unique child custody matter is manifest error"; and (4) that the chancellor's failure to "at least" grant him "reasonable visitation" is "manifest error." While we will address all of Roger's arguments, the only material issue in this appeal is whether the chancellor manifestly erred when he found that Roger failed to prove, by clear and convincing evidence, any of the grounds for overcoming the natural parent presumption. Unless that finding is clearly wrong, Roger is not entitled to custody or visitation regardless of the other issues and arguments that he raises on appeal. Because we find that substantial evidence supports the chancellor's finding, we affirm.

**ANALYSIS**

¶18. "A chancellor's custody decision will be reversed only if it was manifestly wrong or clearly erroneous, or if the chancellor applied an erroneous legal standard." *Smith v. Smith*, 97 So. 3d 43, 46 (¶7) (Miss. 2012) (citing *Johnson v. Gray*, 859 So. 2d 1006, 1012 (Miss. 2003)). "[T]his Court cannot reweigh the evidence and must defer to the chancellor's findings of the facts, so long as they are supported by substantial evidence." *Hall v. Hall*,

---

[5] *Albright v. Albright*, 437 So. 2d 1003 (Miss. 1983).

134 So. 3d 822, 828 (¶21) (Miss. Ct. App. 2014); *see Murphy v. Murphy*, 631 So. 2d 812, 815 (Miss. 1994); *Carter v. Carter*, 735 So. 2d 1109, 1114 (¶18) (Miss. Ct. App. 1999). With these standards in mind, we turn to the issues presented on appeal.

### I.     The Natural Parent Presumption

¶19.    "[T]he natural parent presumption [is] a bedrock principle of Mississippi family law." *K.D.F. v. J.L.H.*, 933 So. 2d 971, 980 (¶35) (Miss. 2006) (quotation marks omitted). "Giving preference to natural parents, *even against those who have stood in their place*, honors and protects the fundamental right of natural parents to rear their children." *Davis v. Vaughn*, 126 So. 3d 33, 37 (¶13) (Miss. 2013) (emphasis added). The presumption has been applied for more than one hundred years. *See id.* at 37-38 (¶13). As our Supreme Court explained in 1879 and again in 2013,

> Nature gives to parents that right to the custody of their children which the law merely recognizes and enforces. It is scarcely less sacred than the right to life and liberty, and can never be denied save by showing the bad character of the parent, or some exceptional circumstances which render its enforcement inimical to the best interests of the child.

*Davis*, 126 So. 3d at 37-38 (¶13) (quoting *Moore v. Christian*, 56 Miss. 408 (1879)).

¶20.    Thus, just last year, our Supreme Court reaffirmed:

> [I]n custody disputes involving natural parents, the natural-parent presumption may ***only*** "be rebutted by clear and convincing evidence that '(1) the parent has abandoned the child; (2) the parent has deserted the child; (3) the parent's conduct is so immoral as to be detrimental to the child; or (4) the parent is unfit, mentally or otherwise, to have custody.'"

*In re Waites*, 152 So. 3d 306, 311 (¶14) (Miss. 2014) (emphasis added) (quoting *Davis*, 126 So. 3d at 37 (¶10) (quoting *Smith v. Smith*, 97 So. 3d 43, 46 (¶9) (Miss. 2012))). Whether

such a showing has been made is "a factual question best left to the trial judge," and "his findings of fact" will be affirmed if they are "neither manifestly wrong nor clearly erroneous." *Davis*, 126 So. 3d at 39-40 (¶20).[6]

### A. Abandonment or Desertion

¶21. A third party may rebut the natural parent presumption through clear and convincing evidence that the natural parent has abandoned or deserted his child. *Davis*, 126 So. 3d at 37 (¶10). "Desertion is defined as 'foresaking one's duty as well as a breaking away from or breaking off associations with some matter involving a legal or moral obligation or some object of loyalty,'" while "abandonment has to do with the relinquishment of a right or claim[.]'" *Id.* at 39 (¶17) (quoting *Petit v. Holifield*, 443 So. 2d 874, 878 (Miss. 1984)).

¶22. The parties dispute exactly when Kaleb knew of Riley's birth and exactly what actions he took in response. Kaleb and his family have maintained that he made efforts to see his child prior to filing a petition to determine paternity and custody in March 2011, but Holly refused, and he finally realized he needed a lawyer. They also maintain that Holly was not served with process until June 2011 only because she and Roger moved frequently and could not be found. In contrast, Roger, his family, and the Jennings maintain that the petition was Kaleb's first contact and that he was not diligent in pursuing it. They also claim that Kaleb

---

[6] In his reply brief, Neely argues that social and legal developments have rendered the natural parent presumption obsolete. He cites, inter alia, the increasing prevalence of "the 'nontraditional family' . . . in our society" and *Obergefell v. Hodges*, 135 S. Ct. 2584 (2015). The argument is procedurally barred because it was raised for the first time in a reply brief on appeal. *Univ. of Miss. Med. Ctr. v. Johnson*, 977 So. 2d 1145, 1158 (¶47) (Miss. Ct. App. 2007). Also, "this court lacks authority to overrule Mississippi Supreme Court precedent." *Hudson v. WLOX Inc.*, 108 So. 3d 429, 432 (¶10) (Miss. Ct. App. 2012).

has admitted that "Roger stood up and was a daddy when I wasn't man enough to be one."

¶23. Regardless of whose version of events is accepted, it is evident that Kaleb did not abandon or desert Riley. To the contrary, he petitioned for genetic testing, a determination of paternity, custody—and for a court order requiring him to pay child support—when Riley was six months old. While an intentional six-month delay in assuming one's parental responsibilities—assuming, solely for the sake of argument, that is what occurred in this case—is cause for moral criticism, it does not rise to the level of legal abandonment or desertion. For example, in *Davis*, the Supreme Court unanimously affirmed the chancellor's finding that the father had not deserted his daughter even though during the first *three and a half years* of her life, his "interaction with her was sporadic, and he contributed little financial assistance." *Davis*, 126 So. 3d at 35 (¶3); *see id.* at 39 (¶¶16-19); *Vaughn v. Davis*, 36 So. 3d 1261, 1262 (¶2) (Miss. 2010) (prior opinion explaining that during this time the father "failed to visit [his daughter] regularly and paid only $100 of support"). In contrast, cases in which abandonment or desertion have been found involved substantially longer and greater derelictions of parental duties than even the worst that is alleged in this case.[7] Roger presents no persuasive authority for his argument that the six-month delay between Riley's

---

[7] *See, e.g.*, *Smith*, 97 So. 3d at 45-46 (¶¶3-4) (finding a mother deserted her son by "long and continuous absences" and lack of support or apparent interest throughout the first six years of his life); *In re Dissolution of Marriage of Leverock & Hamby*, 23 So. 3d 424, 430-31 (¶¶22-23) (Miss. 2009) (finding desertion based on a father's voluntary "complete and total absence of any contact or support for two and a half years of [the] three-year-old [son's] young life"—the father did not "see, talk, or otherwise visit his son," nor did he provide any financial assistance or ever send a birthday or Christmas card or gift); *Hill v. Mitchell*, 818 So. 2d 1221, 1227 (¶¶27-31) (Miss. Ct. App. 2002) (affirming a finding of constructive abandonment where a mother visited her daughter only a few times a year over the first decade of her life).

11

birth and Kaleb's petition, in which Kaleb not only asserted his parental rights but also accepted parental responsibilities, is a period sufficient to constitute desertion, much less abandonment. Therefore, we must affirm the chancellor's finding that Roger failed to prove desertion or abandonment by clear and convincing evidence.

### B. Unfitness or Harmful Immoral Conduct

¶24. Where neither abandonment nor desertion is proven, a third party seeking to overcome the natural parent presumption must prove by clear and convincing evidence that the natural parent is engaging in conduct so immoral as to be a detriment to the child or that the parent is "mentally or otherwise" unfit for custody. *Davis*, 126 So. 3d at 37 (¶10). For example, the Supreme Court has upheld a chancellor's finding of harmful immorality where the father compelled his son to make false charges of sexual abuse against his maternal uncle. This not only showed "a profound lack of respect for honesty, truth, and rectitude of conduct" but also taught the son that it was appropriate to lie "to gain his desire," without regard to the lie's impact on others. *S.C.R. v. F.W.K.*, 748 So. 2d 693, 700 (¶43) (Miss. 1999). The Supreme Court upheld a chancellor's finding of unfitness based on proof that the father had abused drugs and alcohol in his son's presence, drove drunk with his son in the car, exposed his son to "sexual situations," carried on sexual relationships with married women, and threatened and abused his son. *In re Custody of M.A.G.*, 859 So. 2d 1001, 1004 (¶7) (Miss. 2003). And this Court has upheld a finding of parental unfitness where the chancellor heard credible evidence that the father, among other things, abused alcohol, drove drunk with his children in the car, gave his eleven-year-old son alcohol, sold "pills" out of his house, got into

12

fistfights, and failed to provide minimal food or supervision or a safe or sanitary home. *See Lucas v. Hendrix*, 92 So. 3d 699, 701-05, 707 (¶¶4-13, 19) (Miss. Ct. App. 2012).

¶25. In contrast, evidence of a parent's occasional intoxication, past (as opposed to present) drug use, and an occasional temper are not clear and convincing evidence of unfitness. *See Westbrook v. Oglesbee*, 606 So. 2d 1142, 1146 (Miss. 1992). In another case, it was held that the parent's "admitted . . . high temper and . . . difficulty controlling it," which included occasionally violent behavior, was not clear and convincing evidence of moral unfitness. *See Moody v. Moody*, 211 So. 2d 842, 843-44 (Miss. 1968). In short, to overcome the natural parent presumption, there must be clear and convincing evidence of conduct or unfitness "presenting a genuine serious danger to the child." Deborah H. Bell, *Mississippi Family Law* § 5.06[2][a], at 121 (2005).

¶26. Roger alleged that Kaleb abused or neglected Riley, and his witnesses testified to seeing marks, scratches, and diaper rashes on Riley after she returned from Kaleb's custody. Kaleb and his family denied all this and made similar allegations against Roger. Ultimately, both the GAL and the chancellor concluded that there was no credible evidence—much less clear and convincing evidence—to support anyone's claims. As the chancellor noted, the rashes, scratches, and bruises testified to are the sorts of things that "happen with all children." Further, no witness testified that they had personally witnessed Kaleb behave in a manner harmful to Riley. Thus, substantial evidence supports the chancellor's finding that there was no proof of abuse, neglect, harmful immoral conduct, or other parental unfitness. Accordingly, Roger failed to meet his burden of proof on these issues as well, and the

chancellor did not err by finding that he had not overcome the natural parent presumption.

## II.    Roger's Other Arguments Regarding Custody

¶27.    Because Roger failed to overcome the natural parent presumption by clear and convincing evidence, he is not entitled to custody.  As the surviving biological parent, Kaleb is entitled to sole custody.  *See Waites*, 152 So. 3d at 311 (¶14); *Davis*, 126 So. 3d at 37 (¶¶10-12); *Smith*, 97 So. 3d at 49 (¶17) (holding that "an *Albright* analysis was justified" *because* "the natural-parent presumption . . . was properly rebutted"); *M.A.G.*, 859 So. 2d at 1004 (¶6) ("As far back as 1929, this Court has held that when one parent dies, the other parent has a right to the child's custody until there has been abandonment or the living parent has forfeited that right by immoral conduct." (citing *Stegall v. Stegall*, 151 Miss. 875, 119 So. 802, 803 (1929)); Miss. Code Ann. § 93-13-1 (Rev. 2013) ("The father and mother are the joint natural guardians of their minor children and are equally charged with their care . . . .  If either father or mother die . . . , the guardianship devolves upon the surviving parent.").  This clear principle is dispositive.  However, Roger presents a series of additional arguments, which we will address.

¶28.    First, Roger claims in his first issue on appeal that the chancellor erred because he "ignored" Riley's best interest in that he failed to conduct an *Albright* analysis.  But as discussed just above, in a custody dispute between a natural parent and a third party, the chancellor may proceed to an *Albright* analysis *only* if the third party *first* overcomes the natural parent presumption.  Roger failed to meet this burden, and so this argument fails.  The chancellor did not "ignore" Riley's best interest.  He properly adhered to the "bedrock

14

principle of Mississippi family law" (*K.D.F.*, 933 So. 2d at 980 (¶35)) that, absent clear and convincing proof to the contrary, "it *is* in [Riley's] best interest to remain with [her] natural parent" (*Davis*, 126 So. 3d at 37 (¶10) (emphasis added) (quoting *Leverock*, 23 So. 3d at 429 (¶19))). Accordingly, Roger's first issue on appeal is without merit.

¶29.  Roger also claims that he is entitled to custody because he is "*in loco parentis*." But *in loco parentis* status *only* grants "a right to custody of the child 'as against *third persons*.'" *Davis*, 126 So. 3d at 37 (¶11) (quoting *Farve v. Medders*, 128 So. 2d 877, 879 (Miss. 1961)). "[S]uch rights are inferior to those of a natural parent. Thus, in a custody dispute between one standing in loco parentis and a natural parent, the parent is entitled to custody unless the natural-parent presumption is rebutted." *Id.* at (¶12). Again, Roger's failure to overcome the natural parent presumption means that Kaleb retains custody. This argument also lacks merit.

¶30.  The Supreme Court has now made clear that only "in very limited, unique situations" can *in loco parentis* "sometimes be used to *help* rebut the natural-parent presumption." *Smith*, 97 So. 3d at 47 (¶11) (emphasis added) (citing *J.P.M. v. T.D.M.*, 932 So. 2d 760 (Miss. 2006); *Griffith v. Pell*, 881 So. 2d 184 (Miss. 2004)). This is not one of those limited, unique situations. In *Smith* and again in *Waites*, the Supreme Court emphasized that "[i]n both *Pell* and *J.P.M*, a husband learned during the pendency of divorce proceedings that he was not the biological father of a child born of, or just prior to, the marriage." *Waites*, 152 So. 3d at 312 (¶15) (quoting *Smith*, 97 So. 3d at 47 (¶11) (citing *J.P.M.*, 932 So. 2d at 762; *Pell*, 881 So. 2d at 185)). And in *Pell* and *J.P.M.*, the Court found "that the natural-parent presumption had been overcome based on several facts: (1) the husbands stood *in loco*

15

*parentis*; (2) they had supported, cared for, and treated the child as their own; (3) they could have been required to pay child support . . . ; and (4) the biological fathers were not really in the picture." *Smith*, 97 So. 3d at 47 (¶11) (citing *Pell*, 881 So. 2d at 186-87; *J.P.M.*, 932 So. 2d at 767-70). In *Pell*, the father had expressly disclaimed his parental rights, and in *J.P.M.* the father could not even be determined. *See id.* The Supreme Court recently made clear that the doctrine of *in loco parentis* and the holdings of *Pell* and *J.P.M.* will not assist a stepparent in overcoming the natural parent presumption when the biological father *is* "in the picture" and asserts his custodial rights. *Waites*, 152 So. 3d at 313-14 (¶18). Because Kaleb is "in the picture," Roger's reliance on *Pell* and *J.P.M.* is misplaced.[8]

¶31. Roger also relies on the (rebuttable) presumption that a child born during a marriage was fathered by the husband, which our Supreme Court has described as follows:

> Our law has long presumed a child born during the course of a marriage to have been fathered by the husband. This idea is traceable at least to Lord Mansfield, whose rule that children conceived in marriage are products of the marriage was relaxed only when the husband was beyond the "four seas" of England. The presumption of legitimacy is one of the strongest known to our law. In light of the relentless nature of the human libido, cases such as this abound in the reports. Gradually, the presumption has bowed to realism.

*Karenina ex rel. Vronsky v. Presley*, 526 So. 2d 518, 523 (Miss. 1988) (citations omitted). This presumption plays no role whatsoever in this case. Roger and Holly were married less

---

[8] Because Roger is not entitled to custody regardless of whether he is considered *in loco parentis*, we need not decide whether he acquired that status based on his commendable love of and care for Riley prior to Kaleb's petition to establish paternity and parental rights. "The term *in loco parentis* means 'in the place of a parent.'" *Smith*, 97 So. 3d at 47 (¶10) (quoting *Farve*, 128 So. 2d at 879). Roger would not have been acting "in the place of a parent" once Kaleb established his paternity and began exercising visitation rights and fulfilling his support obligations.

16

than three weeks before Riley was born, and Roger admits that he has known from the beginning that he was not the father. As the Supreme Court recognized, "we would appear a bit foolish to declare that the husband was the father" when, as in this case, "biology tells us" that he was not. *Id.* The presumption is rebutted and carries no weight in such cases.

¶32. Roger also argues that the chancery court "implicitly recognized" that his "custodial standing" is "at least equal to that of Kaleb" when it entered the November 2011 agreed order, which provided that Riley's surname would remain Neely. There is nothing in the agreed order to support this argument. Rather, the agreed order unequivocally established *Kaleb's* paternal rights. Other than his surname, Roger is not *mentioned* in the order, much less is he granted *any* rights. It is logical that Riley's last name remained Neely because that was her mother's last name, not as an implied grant of rights to Roger.

¶33. Roger next argues that the November 2012 temporary order alternating custody between him and Kaleb was also an "implicit" recognition that his "custodial standing" was "at least equal to" Kaleb's. This argument fails as well. "A temporary [custody] order is just that, temporary; it does not change the underlying burden of proof . . . ." *Baumgart v. Baumgart*, 944 S.W.2d 572, 573 (Mo. Ct. App. 1997); *accord Anderson v. Anderson*, No. CA 08-1110, 2009 WL 1017480, at *3 (Ark. Ct. App. Apr. 15, 2009) (unpublished op.) ("[A] temporary [custody] order is just that—temporary by nature."). The chancellor decides the issue of permanent custody "de novo" notwithstanding the prior entry of a temporary custody order. *See Blevins v. Bardwell*, 784 So. 2d 166, 170 (¶14) (Miss. 2001). The temporary order did not override the natural parent presumption.

17

### III. Visitation

¶34. Finally, Roger contends that the chancellor's failure to grant him reasonable visitation was manifest error. In his closing remarks from the bench, the chancellor did state that he felt that Roger was entitled to some form of visitation, but in his final order modifying custody, only Riley's maternal grandparents were granted visitation rights. *See* Miss. Code Ann. § 93-16-3 (Rev. 2013) (providing for grandparent visitation rights in certain circumstances). The chancellor's resolution of this issue was correct. Just as with the issue of custody, unless there is clear and convincing evidence to rebut the natural parent presumption, a stepfather "has no right to visitation with his stepchilden under the laws of the State of Mississippi." *Pruitt v. Payne*, 14 So. 3d 806, 811 (¶11) (Miss. Ct. App. 2009); *see also Scruggs v. Saterfiel*, 693 So. 2d 924, 926 (Miss. 1997) (concluding that it is up to the Legislature "to expand [visitation] rights . . . to siblings or other third parties as it sees fit"). As discussed above, Roger did not overcome the natural parent presumption by clear and convincing evidence. Therefore, the chancellor did not err by not granting him visitation.

### CONCLUSION

¶35. The chancellor did not err in applying the natural parent presumption in favor of Kaleb. Nor did he err by finding that Roger failed to rebut the presumption. Roger did not meet his burden of proving by clear and convincing evidence any of the grounds for rebutting the presumption, and therefore we cannot say the chancellor's ruling was error. Roger's other assignments of error are without merit. We therefore affirm.

¶36. **THE JUDGMENT OF THE SIMPSON COUNTY CHANCERY COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.**

**LEE, C.J., IRVING AND GRIFFIS, P.JJ., BARNES, ISHEE, CARLTON, MAXWELL AND FAIR, JJ., CONCUR. JAMES, J., CONCURS IN PART WITHOUT SEPARATE WRITTEN OPINION.**