# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2017-CA-01467-COA

**MARCUS KARL SANDERS**                                    **APPELLANT**

**v.**

**SUMIE SANDERS**                                          **APPELLEE**

DATE OF JUDGMENT:             09/19/2017
TRIAL JUDGE:                  HON. DOROTHY WINSTON COLOM
COURT FROM WHICH APPEALED:    OKTIBBEHA COUNTY CHANCERY
                              COURT
ATTORNEY FOR APPELLANT:       JAMES PAUL TINSLEY
ATTORNEY FOR APPELLEE:        CARRIE A. JOURDAN
NATURE OF THE CASE:           CIVIL - DOMESTIC RELATIONS
DISPOSITION:                  AFFIRMED - 05/14/2019
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**BEFORE J. WILSON, P.J., GREENLEE AND McCARTY, JJ.**

**J. WILSON, P.J., FOR THE COURT:**

¶1.     Marcus and Sumie Sanders consented to an irreconcilable differences divorce and agreed that the chancellor would determine custody of their daughter, Kristen, and related issues.  After a trial, the chancellor awarded Sumie physical custody of Kristen and granted Marcus reasonable visitation.  Marcus argues that the chancellor's custody decision was based on a flawed *Albright* analysis.  He also argues that the chancellor failed to address his request for declaratory relief related to an alleged risk of international child abduction.  Finally, Marcus argues that the chancellor erred by following an unapproved local rule regarding temporary custody hearings.  We find no error and affirm.

## FACTS AND PROCEDURAL HISTORY

¶2. Marcus Sanders moved from Mississippi to Japan to teach English. In Japan, he began a relationship with Sumie, a Japanese citizen. Marcus and Sumie married in 2011. In addition to teaching, Marcus started a business making YouTube videos. Sumie worked for a pharmaceutical company and also studied law. In 2013, Sumie gave birth to Kristen, the couple's only child. After Kristen's birth, Sumie stayed at home, which led to some financial difficulty for the family. In 2014, they decided to move to Mississippi to be closer to Marcus's family and save money. Sumie also testified that Marcus was unhappy in Japan and wanted to move home to Mississippi.

¶3. After Marcus moved to Mississippi, Sumie and Kristen remained in Japan for three months while Sumie waited to obtain a visa. When Sumie and Kristen finally arrived in Mississippi, they moved with Marcus into his parents' home in Ethel. Marcus had decided to focus on his growing YouTube business, and in Ethel he was able to record and produce his videos in a studio on his parents' property that his father had built. Sumie did not work outside the home, although she did earn some money online by buying and selling American brand name items to people in Japan.

¶4. Marcus primarily worked on his YouTube videos at night, so Sumie was Kristen's primary caregiver. Marcus's parents, Mark and Melinda, also helped with Kristen's care. Marcus usually was asleep during the day due to his unusual work hours, but he did occasionally play with Kristen or help put her to bed at night.

¶5. Sumie did not have a car or a driver's license when they moved in with Marcus's

parents; thus, she had to rely on her mother-in-law for transportation. Even after Sumie obtained a driver's license, she had to ask her mother-in-law to borrow a car. Sumie was not happy in Ethel. After living with Marcus's parents for about a year, Marcus, Sumie, and Kristen moved to an apartment in Starkville. Living in Starkville allowed Sumie to take Kristen on outings to local events, the library, book stores, and the swimming pool at their apartment complex. Sumie made some new friends who also had children, and they would often have playdates. Sumie and Marcus shared a car, but she testified that Marcus did not allow her to go any farther than Columbus without his permission.

¶6. In late 2015, Marcus and Sumie had a fight. In the heat of the moment, Sumie said that she might just "disappear." Marcus testified that this remark scared him and that he became fearful that Sumie would abscond with Kristen to Japan. He started keeping Kristen's passport locked away from Sumie.

¶7. In March 2016, Marcus went to Atlanta to visit some friends. While he was out of town, Sumie left the home. She and Kristen went to a domestic abuse shelter, although Sumie does not allege that Marcus ever physically abused her or Kristen. She testified that she left because she was fearful for her safety and her daughter's safety because Marcus had become extremely controlling. Sumie testified that Marcus prevented her from traveling freely and tightly controlled her spending. She said that Marcus always wanted receipts for any money that she spent and would not give her access to the family Amazon account.

¶8. When Sumie moved out, she filed a complaint for divorce and for custody of Kristen. Marcus answered and filed a counterclaim for divorce and custody. On April 22, 2016, an

3

agreed order was entered setting a hearing on temporary matters, including custody. The order provided that temporary matters would be decided based on affidavits submitted by the parties. Both parties submitted multiple affidavits. On May 9, 2016, the chancery court entered a temporary order granting Sumie temporary physical custody of Kristen, granting Marcus temporary visitation of every other weekend plus three weeks during the summer, and granting the parties temporary joint legal custody. In February 2017, the parties withdrew their fault-based claims for divorce and consented to an irreconcilable differences divorce. They agreed that the chancellor would determine Kristen's custody, visitation, and related issues. In March 2017, the case proceeded to trial on the stipulated issues.

¶9. After the separation, Marcus moved back to his parents' home in Ethel, and Sumie and Kristen moved back into the couple's apartment in Starkville. Sumie testified that she had been looking for work in Mississippi, but she was unable to find a job. She testified that she had some interviews scheduled in New York but that if she could not find a job in the United States, she intended to return to Japan. While Marcus had Kristen for three weeks of visitation under the temporary custody order, Sumie went home to Japan to visit her family. While Sumie was in Japan, she obtained certifications that she thought might help her find a job as a fitness, diving, or swimming instructor. She and Kristen had been able to get by on temporary child support and alimony, as well as money that her mother sent from Japan.

¶10. Sumie testified that if she ever did move back to Japan, she would want Marcus to have lengthy visits with Kristen twice a year. She agreed that Marcus and Kristen should have a relationship and that he was not a bad father. But she also believed that Marcus did

not always think about his family and how his actions affected them. She pointed to the fact that Marcus worked most nights and slept during the day and rarely ate meals with her and Kristen.

¶11.   Marcus testified that he had modified his working hours since the separation in order to be able to take care of Kristen during visitation. He denied any suggestion that he was not around to help care for Kristen. He testified that he would often play with her or watch TV with her when they lived at his parents' home in Ethel. He acknowledged that his working hours were unusual, but he believed that he saw Kristen more often than a parent who worked a "normal" nine-to-five job.

¶12.   Marcus asserted that Sumie did not give Kristen enough attention. He thought that Sumie was on her computer too much and that she allowed Kristen to watch age-inappropriate videos. He also said that Sumie did not pay enough attention to Kristen's clothing and shoe needs. He claimed that Kristen's shoes were slightly too large and were causing blisters. He was also concerned about Kristen's education if Sumie moved back to Japan because Kristen's Japanese is not on par with her peers in Japan.

¶13.   Marcus denied that he was controlling. He said Sumie had access to his parents' car when they lived in Ethel and could make trips to the grocery store. Marcus acknowledged that Sumie was unhappy in Ethel, but he said that she did not make an effort to socialize with others. He denied telling her that she could not go farther than Columbus but admitted that he did have some trust issues after Sumie said that she might "disappear." He also admitted that he kept Kristen's passport after that incident. Thus, he knew that Sumie had not left the

country when she left the marital home in March 2016.

¶14.    Juyong Lee, a friend of Sumie's, testified that Sumie was a good mother. She said she had never seen any red flags in Sumie's parenting and that Kristen was a good child. Lee and Sumie met through Sumie's involvement with an outreach program for Japanese culture at Mississippi State University.

¶15.    Sumie's therapist, Dr. Diane Prude, testified that Sumie and Kristen had a strong bond and that Kristen was a normal, happy child. Prude testified that Sumie was less stressed and had better self-esteem since her separation from Marcus.

¶16.    Megan Houston, who lived at the same apartment complex as Sumie and Marcus, testified about her friendship with Sumie. Both Houston and Sumie are stay-at-home mothers with small children, and their children play together several times each week. Houston testified that Sumie is loving, kind, and attentive to Kristen. From Houston's perspective, Kristen was ahead of her peers in her abilities and development. She saw no issues with Sumie's parenting. Houston said that she had not had much interaction with Marcus, so she could not comment on his parenting skills.

¶17.    Marcus's parents both testified. His mother, Melinda, testified that Sumie did not properly supervise Kristen. She said that once Sumie gave Kristen a q-tip, which Kristen could have stuck in her ear. Melinda also found Kristen playing with plastic shopping bags once. Melinda testified that Sumie did not have Kristen on a "set schedule" and that Kristen often did not go to sleep until 11 p.m. Melinda also said that Sumie did not buy clothes and shoes that fit Kristen. She said Kristen often had blisters from wearing shoes that were too

small. According to Melinda, Marcus had a lot of interaction with Kristen, but Sumie paid more attention to her computer than her child.

¶18. Marcus's father, Mark, testified similarly. He said Sumie was on her computer too much and sometimes neglected changing Kristen's diapers. Mark testified that his son always made time to play with Kristen. Mark also noted that Kristen had blisters on her feet from her shoes. He also expressed concern about Kristen's language skills, and he believed that the divorce had harmed her emotionally.

¶19. Following the trial, the chancellor entered a final judgment on custody and related issues. After considering the *Albright* factors, *see Albright v. Albright*, 437 So. 2d 1003, 1005 (Miss. 1983), the chancellor found that it was in Kristen's best interest for Sumie to have physical custody, for Marcus to have reasonable visitation, and for the parties to share legal custody. The chancellor noted that Marcus had concerns that Sumie would move back to Japan, but the chancellor stated that she could not "anticipate something that has not or may never occur," and she would not "place any restrictions on [Sumie's] travel at this juncture." The chancellor specifically declined to require Marcus to turn over Kristen's passport to Sumie. The chancellor reasoned that Marcus had joint legal custody and, thus, had as much right to have the passport as Sumie. The chancellor stated that she was not preventing Sumie from requesting the passport from Marcus. Nor did she intend to prevent Sumie from traveling to Japan with Kristen. Rather, the chancellor urged the parties to resolve such issues "in a mature manner that puts their daughter's interest above their own." The chancellor concluded that if disputes over travel ever arose, the court could address them

7

based on "proper pleadings." However, the issue was not yet "ripe for consideration." Marcus filed a timely notice of appeal from the final judgment.

¶20. On appeal, Marcus challenges the chancellor's *Albright* analysis and decision on physical custody. He also argues that the chancellor failed to adequately address his request for declaratory relief barring Sumie from moving to Japan with Kristen. Finally, he argues that the chancellor improperly followed an unapproved local rule providing for temporary custody matters to be decided on affidavits. We find no reversible error and affirm.

## ANALYSIS

### I. *Albright* Analysis

¶21. "A chancellor's custody decision will be reversed only if it was manifestly wrong or clearly erroneous, or if the chancellor applied an erroneous legal standard." *Smith v. Smith*, 97 So. 3d 43, 46 (¶7) (Miss. 2012). "[T]his Court cannot reweigh the evidence and must defer to the chancellor's findings of the facts, so long as they are supported by substantial evidence." *Hall v. Hall*, 134 So. 3d 822, 828 (¶21) (Miss. Ct. App. 2014). Thus, on appeal in a child custody case, the issue is not whether this Court "agrees with the chancellor's ruling," but only whether "the chancellor's ruling is supported by credible evidence." *Hammers v. Hammers*, 890 So. 2d 944, 950 (¶14) (Miss. Ct. App. 2004).

¶22. In any child custody case, the "polestar consideration . . . is the best interest and welfare of the child." *Albright*, 437 So. 2d at 1005. The chancellor must consider the following factors: (1) age, health, and sex of the child; (2) which parent had "continuity of care prior to the separation"; (3) parenting skills; (4) willingness and capacity to provide

primary child care; (5) both parents' employment responsibilities; (6) physical and mental health and age of the parents; (7) emotional ties between parent and child; (8) moral fitness; (9) "the home, school and community records of the child"; (10) the child's preference, if the child is at least twelve years old; (11) the stability of the home environment and employment of each parent; and (12) any "other factors relevant to the parent-child relationship" or the child's best interest. *Id.*

¶23. The chancellor must address each factor that is relevant to the case, but she does not have to decide that each factor favors one parent or the other. *Harden v. Scarborough*, 240 So. 3d 1246, 1251 (¶11) (Miss. Ct. App. 2018) (citing *Powell v. Ayars*, 792 So. 2d 240, 244 (¶10) (Miss. 2001); *Weeks v. Weeks*, 989 So. 2d 408, 411 (¶12) (Miss. Ct. App. 2008)). "Nor does *Albright* require that 'custody must be awarded to the parent who 'wins' the most factors.'" *Id.* (quoting *Blakely v. Blakely*, 88 So. 3d 798, 803 (¶17) (Miss. Ct. App. 2012)). Rather, the chancellor is simply required to address and consider the relevant factors in determining what custody arrangement would be in the child's best interest. "We review the chancellor's application of the factors for manifest error, giving deference to the weight he assigned each factor." *Id.* (quoting *Smith v. Smith*, 206 So. 3d 502, 513 (¶24) (Miss. 2016)).

¶24. Marcus argues that the chancellor erred in her *Albright* analysis by disregarding evidence of his good parenting skills and by relying on photos as proof of Sumie's parenting skills. Specifically, Marcus challenges the chancellor's findings as to continuity of care, parenting skills, willingness and capacity to provide child care, stability of the home environment, and "other relevant factors." The chancellor found that the continuity of care

9

and parenting skills factors favored Sumie, while the home, school, and community factor favored Marcus. All other relevant factors were found to be neutral. We address Marcus's challenges to specific factors in turn.

¶25. *Continuity of care*. The chancellor found that Sumie had "always" been Kristen's primary caregiver, "[b]oth prior to and after the . . . [t]emporary [o]rder." Marcus argues that the chancellor should have given greater weight to the time prior to the parties' separation. However, all witnesses testified that Sumie watched Kristen throughout the day, cared for Kristen's daily needs, and took Kristen to doctor's appointments and playdates. There was also testimony that, prior to the separation, Marcus's role was decidedly more limited than Sumie's. Though some of Marcus's witnesses alleged that Sumie was inattentive, there was no serious dispute that she was the primary caregiver. The totality of the evidence—both pre- and post-separation—supports the chancellor's finding on this factor.

¶26. *Parenting skills*. The chancellor found that there was little-to-no testimony about Marcus's parenting skills but that there was "reliable and consistent" testimony about Sumie's skills. The chancellor also noted that there were photographs "regarding the same" testimony about Sumie's skills. The chancellor acknowledged that Marcus's parents expressed various concerns related to Sumie's parenting skills and alleged inattentiveness. However, the chancellor found that Marcus's parents' testimony did not establish any immediate threat of harm to Kristen or cause the court any concern. Moreover, the chancellor "did not find [Marcus's parents'] testimony particularly helpful, in that both were clearly biased toward [Marcus]."

¶27. On appeal, Marcus alleges that the chancellor erred by relying on photos as evidence of parenting skills and by disregarding his parents' concerns. However, there is ample support in the record for the chancellor's findings. Several witnesses testified that Sumie was a good, attentive mother. And, again, there was testimony that Marcus's role as a caregiver was far more limited. The chancellor did mention photos that showed Sumie and Kristen happily spending time together, but there is nothing to suggest that she gave the photos excessive weight. Finally, the chancellor did not disregard the testimony of Marcus or his parents. Rather, the chancellor simply found other testimony more credible. In cases such as this, it is the role and duty of the chancellor to make such credibility determinations and to weigh and assess conflicting evidence. *Mayton v. Oliver*, 247 So. 3d 312, 322 (¶33) (Miss. Ct. App. 2017).

¶28. *Willingness and capacity to provide primary childcare and employment responsibilities*. The chancellor found that these factors were neutral. She pointed out that Marcus has changed his work schedule to allow him to help care for Kristen during the day. Marcus argues that the chancellor erred by finding these factors neutral. He says that the capacity to provide childcare necessarily involves capacity to provide for the child. Thus, he argues, his greater present earning capacity should outweigh Sumie's present ability to spend more time with Kristen. Marcus argues that the chancellor did not properly weigh Sumie's present unemployment.

¶29. Sumie is currently a stay-at-home mother who is looking for employment. The chancellor did not give this fact excessive weight either pro or con. Rather, the chancellor

found that the parties' respective capacities to provide childcare were different but essentially neutral. We cannot say that this is error, as it is supported by substantial evidence. *Cf. Vassar v. Vassar*, 228 So. 3d 367, 375-76 (¶¶29, 32) (Miss. Ct. App. 2017) (recognizing that one parent may have a greater capacity to provide childcare because of unemployment, even if that "may seem to unfairly penalize [the other parent] for holding down a job").

¶30. *Stability of the home environment.* The chancellor found that neither parent had a fixed, permanent home because Sumie said she may have to move if she cannot find a job and because Marcus lived with his parents at the time of trial. Marcus says that the chancellor should have considered his extended family in the area and his parents' ability to be present in Kristen's life. He says that this would have led the chancellor to find this factor in his favor. However, the chancellor did consider Marcus's close, extended family and the benefit of that family for Kristen. She just considered it under the "home, school, and community record" factor. The chancellor was aware of the facts and gave them weight as she saw fit.

¶31. *Other factors relevant to the parent-child relationship.* The chancellor stated that there were no other factors to consider, "with the exception of the possibility that [Sumie] may return to her home country of Japan." She then awarded physical custody to Sumie. Marcus argues that this "passing" reference to his fears that his daughter will be taken to Japan is error because the chancellor failed to fully consider the alleged threat of international child abduction.

¶32. Though the chancellor did not discuss in depth the possibility of Sumie returning to

12

Japan during her discussion of the *Albright* factors, she did address it later in her ruling. Regardless, there was no evidence that Kristen was in immediate danger of international abduction. Sumie testified that she hoped to get a job in the United States. She admitted that she would return to Japan if she had no other options, but she testified that if that occurred, she wanted Kristen to have lengthy visits with Marcus twice a year. There was nothing from which the chancellor should have concluded that Kristen was in danger of abduction, and we decline to find error simply because she did not address Marcus's concerns to his satisfaction.

¶33.    To conclude, we find that the chancellor's *Albright* analysis was supported by substantial evidence. We therefore affirm her award of physical custody to Sumie.

## II.    Declaratory Relief

¶34.    In his answer to Sumie's complaint for divorce, Marcus sought declaratory and injunctive relief to prevent Sumie from leaving Mississippi with Kristen. He also asked the court to notify the FBI, the Japanese embassy and consulate, and the Hague Convention Division of the Japanese Ministry of Foreign Affairs, among other entities, of the risk that Kristen would be abducted. Marcus complains that the chancellor did not address this request for declaratory relief in the final judgment. He alleges that "nothing in the Court's order" prevents Sumie from absconding with Kristen, and that the court "abdicated its responsibility to assert its continuing jurisdiction" over Kristen's custody. He argues that the chancellor both denied his requested relief and failed to address it. Marcus is incorrect in both regards.

¶35.    First, the chancellor did address Marcus's concern that Sumie would move to Japan

13

and take Kristen with her, but she declined to "anticipate something that has not or may never occur." She declined to put any restrictions on Sumie's right to travel and declined to prohibit Sumie from taking Kristen abroad. She did, however, give Marcus the right to keep Kristen's passport in his possession until such time as Sumie needed it. There was no evidence presented at trial from which the chancellor should have found that Sumie intended to abduct Kristen. The chancellor's remedy for Marcus's concerns—allowing him to retain Kristen's passport—was reasonable and equitable under the circumstances.

¶36. Second, in the final judgment, the chancellor ruled that "[a]ny and all other relief requested by the parties is hereby denied[.]" Thus, contrary to Marcus's claim that the chancellor did not address his request for injunctive relief, she denied the same.

¶37. Finally, any outstanding issue that Marcus sought to have the chancellor address is waived on appeal. The parties consented to an irreconcilable differences divorce and to the specific issues that the court would decide. Marcus's request for injunctive relief was not listed in their consent. Mississippi Code Annotated subsection 93-5-2(3) (Rev. 2013) provides that the issues to be decided by the chancellor in an irreconcilable differences divorce must be "specifically set forth." Thus, a court "may decide contested issues in a divorce based on irreconcilable differences," but the court "is limited to the resolution of those issues specifically identified and personally agreed to in writing by the parties." *Myrick v. Myrick*, 186 So. 3d 429, 433 (¶17) (Miss. Ct. App. 2016). Marcus argues that the statute does not require the parties to list issues other than child custody, maintenance, or property division. However, this Court recently held that a party waived pending contempt issues by

14

failing to specify them in her consent to an irreconcilable differences divorce. *Leblanc v. Leblanc*, No. 2017-CA-00600-COA, 2018 WL 5262584, at \*12 (¶70) (Miss. Ct. App. Oct. 23, 2018). Therefore, we also hold that Marcus waived any outstanding request for injunctive relief.

### III. Alleged Unapproved Local Rule

¶38. As discussed above, after Sumie had filed for divorce and custody and Marcus had counterclaimed for the same, they submitted an agreed order setting a hearing on temporary matters, including custody and support. The order stated that the hearing would be "by affidavit(s)" and that all affidavits should be submitted by 5:00 p.m. on the hearing date. In other words, the order contemplated that the court would decide temporary custody based on affidavits and without hearing any live witnesses. Based on the affidavits, the court awarded Sumie temporary physical custody of Kristen. She awarded Sumie and Marcus temporary joint legal custody, and she awarded Marcus temporary visitation every other weekend and for three weeks during the summer.

¶39. On appeal, Marcus argues that the Fourteenth Chancery Court District enforces a local rule requiring temporary custody hearings to be decided by affidavits only. He argues that the rule is invalid because the Mississippi Supreme Court has not approved it. *See* M.R.C.P. 83(b) ("All . . . local rules . . . adopted before being effective must be filed in the Supreme Court of Mississippi for approval."). Marcus further argues that the chancellor's temporary ruling impacted her final ruling, and yet because there was no real hearing on temporary custody, the chancellor's temporary ruling "cannot be reviewed."

¶40.    We find no reversible error for three reasons, two of which are related.  First, the record contains only an agreed order.  The record does not show that there actually is an "unapproved local rule."  The chancery court's website does provide a fill-in-the-blank template for an order setting a hearing on temporary matters by affidavit.[1]  However, there is nothing to show that this template equates to a court *rule* that such hearings must be decided on affidavits alone.  Nor does the template establish that the chancellors of the district will not hold a live hearing or consider live testimony upon request.

¶41.    Second and related, Marcus never raised this issue in the trial court.  There is nothing to show that he ever asked for a live hearing or to present live testimony.  Because Marcus did not raise this issue, we have no way of knowing whether there is an unapproved rule or whether the chancellor would have heard and considered live testimony.  Therefore, the record is inadequate to review Marcus's claim, and the issue is waived and procedurally barred on appeal.  *See, e.g.*, *Adams v. Rice*, 196 So. 3d 1086, 1090 (¶13) (Miss. Ct. App. 2016) ("A party is not allowed to raise an issue for the first time on appeal.").

¶42.    We note that the Supreme Court addressed a similar issue in *Fredericks v. Malouf*, 82 So. 3d 579, 582 (¶¶15-16) (Miss. 2012).  In that case, the defendants argued that they were prevented from obtaining a hearing on their motion to transfer venue because of an unapproved local rule that stated that hearings on motions were not "automatically granted" and that the parties would "be notified by the court" if the court determined that a hearing was necessary.  *Id.* at (¶15).  The Supreme Court concluded that the local rule was "in

---

[1] See http://www.14thchanceryms.com/resources.php (last visited May 8, 2019).

16

derogation of Mississippi Rule of Civil Procedure 83, because [it had] never been submitted to [the Supreme] Court for approval." *Id.* at (¶16). Nevertheless, the Supreme Court also "emphasize[d] that the trial court's rule did not prohibit the [d]efendants from requesting a hearing; there [was] no evidence that the trial court would not [have] consider[ed] such a request; and no order exist[ed] denying such." *Id.* In other words, the unapproved local rule did not excuse the defendants' failure to at least *request* a hearing on their motion. Likewise, in this case, we conclude that the alleged existence of a local rule does not excuse Marcus's failure to request a live hearing on temporary custody.

¶43. A third reason that Marcus's argument is without merit is that he fails to establish any prejudice. "A temporary custody order is just that, temporary; it does not change the underlying burden of proof." *Neely v. Welch*, 194 So. 3d 149, 160 (¶33) (Miss. Ct. App. 2015) (quoting *Baumgart v. Baumgart*, 944 S.W.2d 572, 573 (Mo. Ct. App. 1997) (brackets omitted)). The chancellor must conduct an *Albright* analysis and decide the issue of permanent custody de novo regardless of the temporary order. *See id.* Marcus overstates the significance of the temporary custody order as it relates to the chancellor's final ruling and *Albright* analysis. The chancellor's final judgment found that the continuity of care factor "strongly favor[ed]" Sumie because Sumie had "*always*" been Kristen's primary caregiver, "[b]oth *prior to* and after the issuance of [the] [t]emporary [o]rder." (Emphasis added). The chancellor's analysis was based on the totality of the evidence and only briefly mentioned the temporary custody period. In addition, for the reasons discussed above, there is substantial evidence to support the chancellor's permanent custody decision.

17

## CONCLUSION

¶44.    The chancellor's custody decision was supported by substantial evidence, and Marcus

identifies no other reversible error on appeal.

¶45.    **AFFIRMED.**

**BARNES, C.J., CARLTON, P.J., GREENLEE, TINDELL, McDONALD, LAWRENCE, McCARTY AND C. WILSON, JJ., CONCUR. WESTBROOKS, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.**