# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2017-CA-01679-COA

KAREN A. MONK                                                    APPELLANT

v.

LISA M. FOUNTAIN AND DAVID L.                                   APPELLEES
FOUNTAIN, JR.

DATE OF JUDGMENT:           11/06/2017
TRIAL JUDGE:                HON. D. NEIL HARRIS, SR.
COURT FROM WHICH APPEALED:  JACKSON COUNTY CHANCERY COURT
ATTORNEY FOR APPELLANT:     DIANNE HERMAN ELLIS
ATTORNEY FOR APPELLEES:     CALVIN D. TAYLOR
NATURE OF THE CASE:         CIVIL - CUSTODY
DISPOSITION:                AFFIRMED - 05/12/2020
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

### BEFORE J. WILSON, P.J., GREENLEE AND McCARTY, JJ.

### J. WILSON, P.J., FOR THE COURT:

¶1.     Lisa and David Fountain are the legal and natural parents of K.F.[1]  Karen Monk is David's stepsister and K.F.'s aunt.  Monk filed a petition for custody of K.F. alleging, inter alia, that K.F. was "abused and neglected while in the custody of [Lisa] and/or [David]."  The chancellor denied the petition, finding that Monk failed to overcome the natural parent presumption.  On appeal, Monk argues that the chancellor erred by not appointing a guardian ad litem (GAL) and by not granting her visitation.  For the reasons discussed below, we find no error and affirm.

---

[1] We use initials to protect the privacy of minors involved in the case.

## FACTS AND PROCEDURAL HISTORY

¶2. K.F. was born in September 2009. Her parents, Lisa and David Fountain, married shortly thereafter. The Fountains have always had custody of K.F.

¶3. On March 24, 2014, Lisa filed a petition on behalf of herself, David, and K.F. for a domestic abuse protection order against David's stepsister, Karen Monk. Lisa alleged that Monk had sent the Fountains harassing text messages and repeatedly made false allegations about them to Medicaid and Lisa's employer. The Fountains also suspected that Monk had broken into their home, but there is no evidence to connect Monk to the burglary. Lisa testified in the instant case that her justice court petition was later dismissed because her allegations against Monk did not qualify as domestic abuse.

¶4. On March 31, 2014, Monk filed a petition for a guardianship or custody of K.F. Monk alleged that the Fountains had neglected K.F.'s "medical and other needs"; that their marriage was "violent and volatile"; that they failed "to use safe and proper child restraints for [K.F.], even allowing her to be transported without any . . . restraint at all by an unlicensed driver with a history of driving under the influence"; that they drove "while intoxicated with [K.F.] in the car"; and that K.F. was "abused and neglected while in the care of [Lisa] and/or [David]." In addition, Monk alleged that the Fountains "committed Medicaid and other fraud regarding [K.F. and Lisa's two other minor children]." Monk requested sole legal and physical custody of K.F., an order requiring David and Lisa to pay child support to Monk, and a restraining order prohibiting David and Lisa from coming within 1,500 feet of Monk and K.F. Monk also asked the court to appoint a GAL.

¶5.    The Fountains answered Monk's petition and denied her allegations.  They alleged that they were fit and proper persons to have custody of K.F. and that Monk's petition was frivolous and intended solely to harass them.  The Fountains also filed a counterclaim for a restraining order against Monk.

¶6.    Trial in the case was reset twice.  In March 2015, Monk filed a motion to appoint a GAL.  The motion was based on her petition "raising allegations of abuse and/or neglect by [Lisa and David]."  However, Monk never attempted to set her motion for a hearing.  Nor did she mention her request for a GAL at any time during the subsequent trial.

¶7.    The case was continued again before the first day of trial in October 2015.  The second day of trial was held in October 2017.  The reasons for the two-year delay are not apparent from the record.

¶8.    On the first day of trial, Monk called Lisa and David as adverse witnesses.  Lisa and David denied that they had ever neglected or abused K.F.  They also denied that they had ever driven under the influence with K.F. in the car.  They testified that K.F. had little or no relationship with Monk during the first three-and-a-half years of K.F.'s life.  Around the fall of 2012, K.F. began spending time with Monk and eventually began spending the night at Monk's house frequently.  This lasted for a year or so until the Fountains became concerned that Monk had become "obsessive" and "controlling" about K.F.  Lisa and David then began to limit contact between K.F. and Monk.  Lisa and David testified that Monk began harassing them and making false allegations about them in retaliation.  Lisa testified that she was also concerned when she learned during discovery that Monk was taking Norco, Oxycodone,

Klonopin, Xanax, and other prescription medications.[2]

¶9.    Monk also testified at trial. Her testimony is discussed below.

¶10.   In November 2017, the chancery court entered an opinion and final judgment denying Monk's petition for guardianship or custody. The chancellor found that Monk failed to overcome the natural parent presumption by clear and convincing evidence. The chancellor found that Monk failed to prove that the Fountains had ever abandoned or deserted K.F. by leaving her in Monk's care for an extended period of time. The chancellor noted that Monk admitted on the second day of trial that it had been more than three years since she even saw K.F. The chancellor also found that Monk failed to prove that the Fountains drank excessively or that their drinking affected their ability to care for K.F.

¶11.   The chancellor also rejected Monk's argument that the Fountains were unfit because Lisa's other daughter, I.A., was in the custody of I.A.'s paternal grandmother, Sandra Molina. Molina testified at trial. She acknowledged that she called the Mississippi Department of Human Services (DHS) around 2009 because David had spanked I.A. Molina did not approve of David, who had not yet married Lisa and was not I.A.'s father, being "the one doing the punishment at the home." Molina and Lisa subsequently agreed that I.A. would live with Molina, and DHS looked into the matter but took no action. Lisa continues to see I.A. regularly and pays for her to attend private school. Molina sees K.F., David, and Lisa regularly. Molina testified that she has no present concerns about David or Lisa as parents or about their care of K.F.

_____

    [2] Monk's medical records showing her various prescriptions were admitted into evidence at trial.

4

¶12. Finally, the chancellor noted that Monk had requested visitation in the alternative to guardianship or custody. However, the chancellor held that under Mississippi law an aunt has no right to visitation. The chancellor further stated that all other requests for relief not specifically addressed in his opinion were denied. Monk filed a notice of appeal.

¶13. On appeal, Monk argues that the chancellor erred (1) by not appointing a GAL despite Monk's allegations of abuse and neglect and (2) by not awarding Monk visitation under the doctrine of in loco parentis.

## ANALYSIS

### I. The chancellor did not abuse his discretion by not appointing a GAL.

¶14. "In child-custody cases where [allegations of] abuse and/or neglect are raised, the chancellor's decision to appoint a guardian ad litem may be mandatory or discretionary." *Carter v. Carter*, 204 So. 3d 747, 758-59 (¶50) (Miss. 2016). "The appointment is mandatory where the allegations of abuse and/or neglect rise to the level of a 'charge of abuse and/or neglect,' and in those cases 'the court shall appoint a guardian ad litem for the child as provided under [Mississippi Code Annotated section] 43-21-121, who shall be an attorney.'" *Id.* at 759 (¶50) (quoting Miss. Code Ann. § 93-5-23 (Rev. 2013)). "In these situations the chancellor is required to appoint a guardian ad litem, whether the parties requested a guardian ad litem or not." *Id.*

¶15. "However, under Mississippi Code Section 93-5-23, the chancellor is provided discretion to determine if issues of abuse or neglect have sufficient factual basis to support the appointment of a guardian ad litem." *Id.* at (¶51). The statute gives "the chancellor some

5

discretion in determining whether there is a legitimate issue of neglect or abuse even in those situations where one party elects to make such an assertion in the pleadings." *Id.* (quoting *Johnson v. Johnson*, 872 So. 2d 92, 94 (¶8) (Miss. Ct. App. 2004)). The chancellor is *not* required to "appoint[] . . . a guardian ad litem based merely on an unsubstantiated assertion found in the pleadings of one of the parties." *Id.* at (¶52) (quoting *Johnson*, 872 So. 2d at 94 (¶8)).

¶16. This Court recently summarized:

> [T]he appointment of a GAL is mandatory only if there is a "sufficient factual basis to support" an allegation of abuse or neglect. The chancery court has "discretion" to determine whether such an allegation is "legitimate." If the court concludes that there is no factual basis for the allegation, then the appointment of a GAL is not mandatory.

*Brown v. Hewlett*, 281 So. 3d 189, 197 (¶30) (Miss. Ct. App. 2019) (citations omitted) (quoting *Carter*, 204 So. 3d at 759 (¶¶51, 53)).

¶17. On appeal, Monk argues that the chancellor erred by not granting her motion to appoint a GAL based on her allegations of abuse and neglect. The Fountains initially respond that Monk waived this issue because she never set her motion for a hearing or otherwise raised the issue at any point during the trial. While Monk's failure to obtain a ruling on her motion would constitute a waiver in most circumstances,[3] it does not in this case. The mandatory appointment of a GAL in cases of abuse or neglect is to protect the

---

[3] *See Ridgway Lane & Assocs. Inc. v. Watson*, 189 So. 3d 626, 630 n.4 (Miss. 2016) ("Our rule is that a party making a motion must follow up that action by bringing it to the attention of the judge and by requesting a hearing upon it. It is the responsibility of the movant to obtain a ruling from the court on motions filed by him, and failure to do so constitutes a waiver of the same." (quotation marks omitted)).

child, not the parties. Therefore, if there is a "sufficient factual basis to support" a "legitimate" claim of abuse or neglect, "the chancellor is required to appoint a guardian ad litem, *whether the parties requested a guardian ad litem or not*." *Carter*, 204 So. 3d at 759 (¶¶50-51) (emphasis added). Therefore, we will address this issue despite Monk's failure to pursue her motion in the trial court.

¶18. Prior to trial, Monk did not produce any evidence to support her allegations of abuse or neglect. Near the end of the first day of trial, the chancellor warned Monk: "So far I haven't heard anything about [the Fountains' alleged] unfitness towards [K.F.]. We have been here about six and a half hours." The chancellor further observed that Monk's custody petition appeared to have been filed in response to the justice court action that the Fountains had filed against Monk seven days earlier.

¶19. In response, Monk attempted to articulate the basis of her petition. She first claimed that the Fountains did not "put food in their house" and that she had to "put food in their house" for them. She also stated, "I don't think they take care of their children. They are all about their selves." She also claimed that David had spanked K.F. with a belt or a switch, had cursed at K.F., and had used racial slurs in K.F.'s presence. In addition, she accused David of driving with K.F. after drinking beer, though she could not say that David was under the influence at the time.

¶20. Finally, Monk testified about an alleged incident in which K.F. continued to repeat a curse word after David told her to stop. Monk claimed that David warned K.F. that he would "make [her] eat soap" if she did not stop saying the word. K.F. then said the word

again, and David allegedly poured liquid soap into K.F.'s mouth until Monk knocked the bottle out of his hand. Monk testified that she reported this and other alleged incidents to DHS. However, the Fountains testified that DHS never contacted them about any allegations by Monk. Moreover, on cross-examination, Monk admitted that she failed to mention the soap incident or any other alleged abuse in her responses to interrogatories.[4]

¶21. Monk testified again at the end of the second day of trial. The chancellor again asked her to explain why she believed that the Fountains were "unfit" parents. Monk did not mention any abuse in response. She testified that she could not "say at [that] time" (i.e., October 2017) that the Fountains were "unfit" "because it ha[d] been exactly three years and seven months since [K.F. had been] in [her] presence." She further stated that she understood that the Fountains had a "right" as K.F.'s parents "to have whoever they want in [K.F.'s] life." However, she thought that the Fountains were trying to "punish" her by not allowing her to see K.F. when in fact they were just "punishing" K.F.

¶22. Under the circumstances, we cannot say that the chancellor abused his discretion by not appointing a GAL. In her testimony at trial, Monk made allegations that, *if credible or substantiated*, might have warranted the appointment of a GAL. However, those allegations were made belatedly and only after the chancellor's pointed comments that the first day of trial was nearly complete and that there had been no evidence of parental unfitness. Monk also provided no other evidence to corroborate or substantiate her allegations. In addition,

---

[4] Prior to testifying, Monk called both Lisa and David as adverse witnesses. However, Monk's attorney did not question either Lisa or David about the soap incident or any other specific instance of alleged abuse. Monk's attorney did question David about his alleged use of racial slurs, which David adamantly denied.

Monk's credibility was undercut significantly by the fact that she failed to disclose any specific allegations of abuse in discovery.

¶23. As the Supreme Court stated in *Carter*, section 93-5-23 affords "the chancellor . . . discretion to determine if issues of abuse or neglect have sufficient factual basis to support the appointment of a guardian ad litem." *Carter*, 204 So. 3d at 759 (¶51). That is, the chancellor has "discretion in determining whether there is a legitimate issue of neglect or abuse even in those situations where one party elects to make such an assertion in the pleadings." *Id.* (quoting *Johnson*, 872 So. 2d at 94 (¶8)). And the chancellor is *not* required to appoint a GAL "based merely on an unsubstantiated assertion found in the pleadings of one of the parties." *Id.* at (¶52) (quoting *Johnson*, 872 So. 2d at 94 (¶8)). Under *Carter*, we cannot say that the chancellor was required to appoint a GAL in this case based merely on Monk's unsubstantiated allegations or that the chancellor abused his discretion under the statute. Accordingly, Monk's argument on this issue is without merit.

## II. The chancellor correctly denied Monk's alternative request for visitation.

¶24. Monk also argues that the chancellor should have granted her visitation under the doctrine of in loco parentis. However, Monk did not make this argument in the trial court, so the issue is waived. Moreover, the evidence did *not* show that Monk was "in loco parentis" to K.F.[5] Rather, the evidence showed only that Monk visited frequently with her

---

[5] *See Davis v. Vaughn*, 126 So. 3d 33, 37 (¶11) (Miss. 2013) ("A person in loco parentis is one who stands in place of a parent, having assumed the status and obligations of a parent. Any person who takes a child of another into his home and treats it as a member of his family, providing parental supervision, support and education, as if it were his own child, is said to stand in loco parentis." (citation and quotation marks omitted)).

niece, including overnight visits, for about a year to a year-and-a-half. Monk never stood in the Fountains' place or otherwise "assumed the status and obligations of a parent." *Davis*, 126 So. 3d at 37 (¶11). As K.F.'s aunt, Monk has no right to visit with K.F. over her parents' objection. *Neely v. Welch*, 194 So. 3d 149, 160 (¶34) (Miss. Ct. App. 2015) (holding that relatives other than grandparents have no right to court-ordered visitation), *cert. denied*, 202 So. 3d 1266 (Miss. 2016). Accordingly, this issue is without merit.

## CONCLUSION

¶25. The chancellor did not abuse his discretion by deciding this case without appointing a GAL. In addition, Monk has no right to visitation with K.F.

¶26. **AFFIRMED.**

**BARNES, C.J., CARLTON, P.J., GREENLEE, WESTBROOKS, TINDELL, McDONALD, McCARTY AND C. WILSON, JJ., CONCUR. LAWRENCE, J., NOT PARTICIPATING.**